[No. S011367. Feb. 28, 1991.]

TAMELA HARRIS et al., Plaintiffs and Appellants, v.
CAPITAL GROWTH INVESTORS XIV et al., Defendants and
Respondents.

COUNSEL

Carolyn Burton, Gary F. Smith, Carole F. Grossman, Richard A. Rothschild, Sandra D. Jones and Manuel A. Romero for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston, Deputy Attorney

General, Michael Rawson and James B. Morales as Amici Curiae on behalf of Plaintiffs and Appellants.

Miller, Starr & Regalia, Edmund L. Regalia, Gary E. Rosenberg, Kimberly A. Davis, John G. Sprankling and Harry D. Miller for Defendants and Respondents.

Donna May Campbell, Morrison & Foerster, Barry A. Abbott, Douglas L. Hendricks and Patrick A. Broderick as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**LUCAS, C. J.—**

*Introduction and Summary of Decision*

We consider in this case two issues involving interpretation of the Unruh Civil Rights Act (Civ. Code, §§ 51, 52; hereafter the Unruh Act or the Act; all statutory references are to the Civil Code unless otherwise indicated): (1) does the Act proscribe, as economic discrimination, a landlord's requirement that prospective tenants have gross monthly incomes of at least three times the rent to be charged (the minimum income policy) and (2) can a female plaintiff state a cause of action under the Act by alleging that the minimum income policy has an adverse or disparate impact on women? Our review of the language and history of the Act indicates that both questions must be answered in the negative.

The Unruh Act prohibits denial of access to public accommodations based on specified classifications (i.e., race, sex, religion and others). Economic and financial distinctions are not among the impermissible classifications listed in the statute. Although our decisions have occasionally recognized additional categories of prohibited discrimination (e.g., physical appearance and family status), those categories were based on personal characteristics of individuals that bore little or no relationship to their abilities to be responsible consumers of public accommodations. We find no support in the language or history of the Act for extending our past holdings to encompass economic criteria, which by their nature seek to further the legitimate interest of business establishments in controlling financial risk while providing goods and services on a nondiscriminatory basis.

As to the second issue before us, the language and history of the Unruh Act indicate that the legislative object was to prohibit *intentional* discrimination in access to public accommodations. We have been directed to no authority, nor have we located any, that would justify extension of a disparate impact test, which has been developed and applied by the federal courts primarily in employment discrimination cases, to a general discrimination-in-public-accommodations statute like the Unruh Act. Although evidence of adverse impact on a particular group of persons may have probative value in public accommodations cases and should therefore be admitted in appropriate cases subject to the general rules of evidence, a plaintiff must nonetheless plead and prove a case of intentional discrimination to recover under the Act.

### 1. *The Facts and Proceedings Below*

Plaintiffs Tamela Harris and Muriel Jordan filed a representative action against defendants Capital Growth Investors XIV and XVI (real estate limited partnerships), Independent Planning Realty Corporation (a management firm responsible for operating two apartment buildings owned by the partnerships), five individual managers of the apartment buildings, and other entities. Plaintiffs' first amended complaint challenges defendants' minimum income policy, characterizing it as both arbitrary economic discrimination and sex discrimination based on its alleged adverse statistical impact on women.

The trial court sustained without leave to amend defendants' general demurrers to those causes of action in the first amended complaint concerning the challenged practice. After additional claims were disposed of by stipulation, a judgment of dismissal was entered and plaintiffs appealed. The Court of Appeal reversed as to the economic discrimination claim, holding that it raised factual issues concerning the alleged arbitrariness of defendants' practice that required a trial. It affirmed as to the sex-discrimination-by-adverse-impact claim.

We must determine whether plaintiffs' allegations state a cause of action under the Unruh Act.[1] In reviewing the judgment of dismissal, we accept as true the allegations in the first amended complaint summarized here (see *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 213-214 [197 Cal.Rptr. 783, 673 P.2d 660]):

---

[1] Although plaintiffs' first amended complaint includes a fourth cause of action for injunctive relief under Business and Professions Code section 17200 et seq., plaintiffs have confined their arguments both here and in the Court of Appeal to the Unruh Act. Accordingly, we do not consider the merits of plaintiffs' fourth cause of action or the prospect that defendants' minimum income requirement might offend any provision of law other than the Unruh Act.

Plaintiffs are female heads of low income families whose income consists solely of public assistance benefits; defendants own and operate apartment buildings. Defendants have an express written policy that prospective tenants must have sufficient income, defined as monthly income equal to or greater than three times the rent charged, before they will be considered as prospective tenants of one of defendants' apartments. Although plaintiffs can afford to pay the rent charged by defendants, they do not have incomes equal to three times the rent. For example, plaintiff Muriel Jordan has a monthly income of $698 and defendants' apartments rent for between $275 and $360, depending on size. Because they did not meet defendants' minimum income requirement, plaintiffs were denied the opportunity to rent apartments. Plaintiffs maintain that defendants' policy is grounded solely on unsubstantiated assumptions that persons who meet the specified income standard will more likely pay rent than those who do not.

In addition, plaintiffs allege that a "disproportionate number of families receiving public assistance such as [Aid to Families with Dependent Children] are headed by females"; that "[w]omen generally have lower average income than males"; and that defendants' minimum income policy has unlawfully discriminated against them because of their sex.

### 2. *A Short History of the Unruh Act*

Enacted in 1959, the Unruh Act secures equal access to public accommodations and prohibits discrimination by business establishments. Its predecessor, our state's first public accommodations statute, became law in 1897.[2] It consisted of two primary sections. The first section declared that all citizens were entitled to the "full and equal accommodations, advantages, facilities, and privileges of inns, restaurants, hotels, eating-houses, barbershops, bath-houses, theaters, skating-rinks, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens." (Stats. 1897, ch. 108, § 1, p. 137.)[3] The second section prohibited "denying to any citizen,

---

[2] Before 1897, other statutes governed access to specified places of public accommodation. For example, an 1893 statute made it unlawful for operators of places of public amusement or entertainment to refuse admission to persons over the age of 21 who "present[ed] a ticket of admission acquired by purchase." (Stats. 1893, ch. 185, § 1, p. 220.) A person refused admission in violation of the statute could recover actual damages plus $100. (*Id.*, § 2, p. 220.) Even before 1893, it was a misdemeanor for a common carrier or innkeeper to refuse service to any person. (Pen. Code, § 365.)

[3] The 1897 act was patterned in part after the National Civil Rights Act of 1875 (18 Stat. 335, ch. 114, §§ 1-2) which guaranteed to all persons within United States jurisdiction "the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances on land or water, theaters, and other places of public amusement . . . ." The United States Supreme Court invalidated this federal act in the *Civil Rights Cases* (1883) 109 U.S. 3 [27 L.Ed. 835, 3 S.Ct. 18]. Many states, including California,

except for reasons applicable alike to every race or color," access to the places described in the first section or making "any discrimination, distinction, or restriction on account of color or race, or except for good cause, applicable alike to all citizens of every color or race whatever . . . ." (Stats. 1897, ch. 108, § 2, p. 137.) The two parts of the statute became sections 51 and 52 of the Civil Code in 1905. (Stats. 1905, ch. 413, §§ 1, 2, p. 553.)

Sections 51 and 52 remained substantially unchanged from 1923 to 1959. Although court decisions in the 1950's restricted the places of public accommodation covered by these sections,[4] they also confirmed their application to nonracial forms of discrimination. In *Stoumen* v. *Reilly* (1951) 37 Cal.2d 713 [234 P.2d 969], we held that the State Board of Equalization acted illegally in suspending the license of a bar and restaurant because it allowed patronage by homosexual persons. We stated that: "Members of the public of lawful age have a right to patronize a public restaurant and bar so long as they are acting properly and are not committing illegal or immoral acts; the proprietor has no right to exclude or eject a patron 'except for good cause,' and if he does so without good cause he is liable in damages. (See Civ. Code, §§ 51, 52.)" (*Id.* at p. 716.) Observing there was no evidence of illegality on the premises, we refused to find "good cause" for exclusion of homosexuals. (*Id.* at pp. 716-717.) Using similar analysis, in *McClain* v. *City of South Pasadena* (1957) 155 Cal.App.2d 423, 432-433 [318 P.2d 199], the Court of Appeal construed sections 51 and 52 to prohibit "unreasonable discrimination" and held that a "residents only" restriction on access to a public swimming pool was not unreasonable. (See also *Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734, 739-741 [227 P.2d 449]; *Orloff* v. *Hollywood Turf Club* (1952) 110 Cal.App.2d 340, 342-343 [242 P.2d 660] [applying public accommodations provisions of §§ 51-54 to exclusion of patrons from racetrack because of past bookmaking].)

Sections 51 and 52 were substantially revised in 1959 when they became the Unruh Act. In response to court decisions restricting the places covered by the statute, section 51's list of places was deleted and replaced by a reference to "all business establishments of any kind whatsoever." (Stats. 1959, ch. 1866, § 1, p. 4424.) (See generally Comment, *supra*, 31 UCLA L.Rev. at pp. 450-451; Colley, *Civil Actions for Damages Arising out of Violations of Civil Rights* (1965) 17 Hastings L.J. 189, 191.) In addition, the

---

responded by enacting their own statutes assuring access to public accommodations on a nondiscriminatory basis. (Note, *Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws* (1978) 7 N.Y.U. Rev. L. & Soc. Change 215, 239; hereafter Note.)

[4] For example, courts held that gymnasiums, private schools, cemeteries, and dentist offices were not governed by the Act. (Comment, *The Unruh Civil Rights Act: An Uncertain Guarantee* (1983) 31 UCLA L.Rev. 443, 450, fn. 37; hereafter Comment.)

new section 51 declared that all citizens within the jurisdiction of this state were "free and equal, and no matter what their race, color, religion, ancestry, or national origin" were entitled to full and equal public accommodations. (Stats. 1959, ch. 1866, § 1, p. 4424.) Finally, the reference to "conditions and limitations established by law and applicable alike to all citizens" was changed to read: "This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to citizens of every color, race, religion, ancestry, or national origin." (*Ibid.*)

Section 52 was amended to provide: "Whoever denies . . . or whoever makes any discrimination, distinction, or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of Section 51, is liable for the actual damages, and two hundred fifty dollars ($250) in addition thereto . . . ." (Stats. 1959, ch. 1866, § 2, p. 4424.) The "good cause" reference in the predecessor section was eliminated.

In *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992] (*Cox*), we applied the Unruh Act to an exclusion of a patron of a business establishment for reasons not involving the specific categories listed in the Act, i.e., race, color, etc. The procedural posture of the case was unusual. A habeas corpus petitioner challenged his arrest and conviction under a municipal trespass ordinance for refusing to leave a shopping center after being directed to do so by its owner, contending in part that his conduct was protected by the Unruh Act. We held that a shopping center did not have the right to exclude the customer based only on his association with a young man "who wore long hair and dressed in an unconventional manner." (*Id.* at p. 210.) Despite the listing of specific types of discrimination in the statute, we concluded that the Unruh Act prohibited all "arbitrary discrimination by a business enterprise" and that the listing was "illustrative rather than restrictive" of the kinds of discrimination prohibited by the Act. (*Id.* at pp. 212, 216-217.) We qualified our conclusion by stating that businesses subject to the Unruh Act retained the right to "establish reasonable regulations that are rationally related to the services performed and facilities provided." (*Id.* at pp. 212; see also *id.* at p. 217 & fn. 13.)

Post-*Cox* developments expanded the categories of discrimination covered by the Act. Sections 51 and 52 were amended in 1974 to add "sex" to the list of specifically prohibited forms of discrimination. (Stats. 1974, ch. 1193, §§ 1, 2, p. 2568.)[5] In *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161] (*Marina Point*),

---

[5] Section 52 was again amended two years later to provide for a punitive award of "up to a maximum of three times the amount of actual damages but in no case less than two hundred fifty dollars ($250)" as well as attorney fees. (Stats. 1976, ch. 366, § 2, p. 1013.)

we applied *Cox, supra,* 3 Cal.3d 205, to hold that the owner of an apartment complex violated the Act by refusing to rent to families with minor children. Again, we rejected the view that the Unruh Act was limited to the categories of discrimination specified in its language. (See also *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427] (*O'Connor*) [applying *Marina Point* to hold that a condominium development restricting residency to persons over 18 violates the Act].)

Although interpreting the Act to proscribe discrimination against families with children, we took care in *Marina Point* to distinguish "age-limited admission policies of retirement communities or housing complexes reserved for older citizens." (*Marina Point, supra,* 30 Cal.3d at p. 742.) We concluded that such policies "operate as a reasonable and permissible means under the Unruh Act of establishing and preserving specialized facilities for those particularly in need of such services or environment." (*Id.* at p. 743.)

Reacting to our holdings in *Marina Point* and *O'Connor,* the Legislature affirmed that section 51 prohibits age discrimination in the sale or rental of housing, but enacted detailed provisions allowing an exception, under specified circumstances and within a specified time, for housing designed to meet the physical and social needs of senior citizens. (§§ 51.2, 51.3, 51.4; Stats. 1984, ch. 787, § 1, p. 2781 & Stats. 1984, ch. 1333, § 1, pp. 4681-4682.) Later, it added "blindness and physical disability" as categories of prohibited discrimination under the Act, subject to provisions limiting a property owner's duty to modify existing property and structures. (§§ 51, 52; Stats. 1987, ch. 159, §§ 1, 2, pp. 557-558.)

As a result of the foregoing history, section 51 now provides in pertinent part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or blindness or other physical disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability."

Section 52, which is designed to provide an enforcement mechanism for section 51 and other provisions of law, provides in a manner parallel to section 51: "Whoever denies . . . or whoever makes any discrimination, distinction, or restriction on account of sex, color, race, religion, ancestry, national origin, or blindness or other physical disability contrary to the

provisions of Section 51 . . . is liable for each and every such offense
. . . ."

### 3. *The Cause of Action for Economic Discrimination*

■ Defendants maintain that the Unruh Act does not apply to economic criteria of selection such as the minimum income policy. In this regard, they ask us to reexamine *Cox, supra,* 3 Cal.3d 205, and its progeny and to confine the scope of the Act to its specified classifications, or, at a minimum, to exclude economic and financial criteria from its purview. Plaintiffs respond that, under our prior case law, the Act applies to any distinction among persons judicially determined to be "arbitrary" or "unreasonable." They contend that a trial on the issue of arbitrariness is required because they have alleged that defendants' policy excludes persons who are in fact able to pay rent. We will review the arguments of the parties in light of the language and history of the Act and the implications of plaintiffs' proposed cause of action for economic discrimination.

### a. *A Reexamination of Our Prior Decisions*

Pointing to the language of the Act and its repeated references to specific discriminatory classifications such as race, color, religion, etc., defendants contend that judicial expansion of these classifications to include whatever the courts might label "arbitrary" discrimination cannot be justified.

There is substantial support for defendants' contention in both the language and history of the Unruh Act. When the Act was adopted in 1959, the Legislature extensively revised the prior law. Among other changes, it deleted the "good cause" language that we had construed broadly *in Stoumen* v. *Reilly, supra* (37 Cal.2d at p. 716), to prohibit exclusions of bar and restaurant patrons (including homosexuals). (See Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Interpretation* (1960) 33 So.Cal.L.Rev. 260, 269.) It also gave special emphasis to the list of categories of prohibited discrimination by repeating it *three* times—twice in section 51 and then again in section 52, where it provided a remedy only for discrimination "on account of color, race, religion, ancestry, or national origin." These changes in the language of the statute are evidence of an intent to clarify and narrow its scope. From his comprehensive analysis of the statutory language, including changes made in the legislative process, Professor Horowitz concluded: "The new Sections 51 and 52 seemingly prohibit only discrimination on grounds of race, color, religion, ancestry, or national origin . . . . The old sections prohibited all discrimination except that specifically permitted; the new

sections prohibit only specific types of discrimination." (33 So.Cal.L.Rev. at p. 302; see also *id.* at p. 271.)

There is further evidence that the Legislature intended to confine the scope of the Act to the specified types of discrimination in the second sentence of section 51. That sentence states: "[t]his section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability."

Without substantial discussion, we stated in *Marina Point* that the meaning of this sentence was "obscure" and declined to infer from it any intent to restrict our statements in *Cox* (*supra*, 3 Cal.3d 205) that the Act applies to all "arbitrary" forms of distinction or classification in public accommodations. (*Marina Point, supra,* 30 Cal.3d at pp. 733-735.) On reexamination, we do not find the quoted sentence to be so devoid of meaning. ■ Its plain language suggests that the Act was not intended to create rights of access to public accommodations when: (1) other legislation specifically limited or disclaimed those rights; or (2) those rights were already extended to all persons regardless of sex, color, race, or the other listed categories. (See *Orloff* v. *Hollywood Turf Club, supra,* 110 Cal.App.2d 340, 342-343 [predecessor to quoted sentence allows business establishment to impose admission charge "equally and without discrimination . . . on all citizens"].) Applied to this case, the second sentence of section 51 indicates the Act was not intended to create a right of access to rental housing notwithstanding a landlord's policy of selection based on financial criteria, so long as the policy is applicable alike to all persons regardless of race, color, sex, religion, etc.

Although defendants' argument against *Cox, Marina Point,* and related cases is not without foundation, it does not afford a sufficiently compelling reason to overrule the holdings of *Cox* and its progeny. Beginning with *Cox* in 1970, the Unruh Act has been construed to apply to several classifications not expressed in the statute. (E.g., *Cox, supra,* 3 Cal.3d at pp. 217-218 [unconventional dress or physical appearance]; *Marina Point, supra,* 30 Cal.3d at pp. 736-741 [families with children]; *O'Connor, supra,* 33 Cal.3d at p. 794 [persons under 18]; see also *Rolon* v. *Kulwitzky* (1984) 153 Cal.App.3d 289, 292 [200 Cal.Rptr. 217] [homosexuality]; *Curran* v. *Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712 [195 Cal.Rptr. 325, 38 A.L.R.4th 607] [same]; and *Hubert* v. *Williams* (1982) 133 Cal.App.3d Supp. 1, 5 [184 Cal.Rptr. 161] [same].)

■ We generally presume the Legislature is aware of appellate court decisions. (*Viking Pools, Inc.* v. *Maloney* (1989) 48 Cal.3d 602, 609 [257

Cal.Rptr. 320, 770 P.2d 732]; *Estate of McDill* (1975) 14 Cal.3d 831, 839 [537 P.2d 874].) It has not taken specific action to overrule these cases. Moreover, the Legislature has amended the Act several times in the 20-year period since *Cox* (*supra,* 3 Cal.3d 205) was decided. "[W]hen the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction. Accordingly, reenacted portions of the statute are given the same construction they received before the amendment." (*Marina Point, supra,* 30 Cal.3d at p. 734.)

Thus, defendants' suggestion that the *holdings* of *Cox, Marina Point, O'Connor,* and similar appellate decisions extending the Unruh Act beyond its specified categories of discrimination have somehow been repudiated by the Legislature is untenable; the absence of any specific legislative action designed to alter those holdings belies any such inference. However, our rejection of defendants' suggestion does not necessarily imply acceptance of plaintiffs' contrary argument that all economic distinctions must therefore be scrutinized for alleged "arbitrariness" because the Legislature has effectively endorsed the *broad language* used in those cases.

■ The presumption of legislative acquiescence in prior judicial decisions is not conclusive in determining legislative intent. As we have also stated: " 'Legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval . . . . But something more than mere silence is required before that acquiescence is elevated into a species of implied legislation . . . .' " (*Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 923 [221 Cal.Rptr. 575, 710 P.2d 375], quoting *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1127-1128 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].) In the area of statutory construction, an examination of what the Legislature has done (as opposed to what it has left undone) is generally the more fruitful inquiry. "[L]egislative inaction is ' "a weak reed upon which to lean" ' . . . ." (*Troy Gold Industries, Ltd.* v. *Occupational Safety & Health Appeals Bd.* (1986) 187 Cal.App.3d 379, 391, fn. 6 [231 Cal.Rptr. 861].)

■ In this case, any presumption in favor of legislative acquiescence in the broad concept of "arbitrary discrimination" is weakened by two factors: (1) the specific facts of our prior cases which, unlike their broad language, are confined to discrimination based on personal characteristics similar to the statutory classifications of race, sex, religion, etc.; and (2) evidence of subsequent legislative action emphasizing the continued importance of those classifications.

To acknowledge that the Legislature has not altered the *holdings* in specific prior cases does not imply that it has approved the broad *language* in those decisions to the effect that any classification that might be judicially viewed as "arbitrary" or "unreasonable" or "stereotyped" is therefore subject to judicial scrutiny by virtue of the Act. ■ It is a foundational principle that: " '[T]he language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts.' " (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 734-735 [257 Cal.Rptr. 708, 771 P.2d 406]; see also 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 783, p. 753.) "A litigant cannot find shelter under a rule announced in a decision that is inapplicable to a different factual situation in his own case, nor may a decision of a court be rested on quotations from previous opinions that are not pertinent by reason of dissimilarity of facts in the cited cases and in those in the case under consideration." (*Southern Cal. Enterprises* v. *Walter & Co.* (1947) 78 Cal.App.2d 750, 757 [178 P.2d 785], quoted in 9 Witkin, *supra*, at pp. 754-755.)

The fundamental distinction between holdings and mere descriptive language applies no less to our perceptions that the Legislature has acquiesced in prior judicial decisions. (See 16 Cal.Jur.3d (rev.) Courts, § 192, p. 628 ["The general rule that prior decisions are controlling only as to cases presenting the same factual situation is of course a limitation on the application of stare decisis to statutory construction."].) The Legislature is a pragmatic political body; its primary concern is not to study and refine the language used in judicial decisions, but to accomplish practical results. ■ ■ ■ ■ As such, it is unlikely to analyze and rewrite broad judicial language as an abstract exercise; it is far more likely to revise the "bottom line" results of decisions, particularly those that adversely affect established interest groups.[6]

---

[6]The central fallacy underlying the dissent is its unwarranted assumption that the Legislature has not only endorsed and approved the broad language in our prior Unruh Act opinions, but has effectively approved their extension to the realm of economic criteria of customer selection. The only palpable evidence offered in support of this view is a letter to the Governor from the Chairman of the Select Committee on Housing and Urban Affairs accompanying a 1974 amendment adding "sex" to the list of proscribed forms of discrimination. The letter refers to our decision in *Cox* (*supra*, 3 Cal.3d 205) and its language that all "arbitrary" forms of discrimination are prohibited by the Act. We also referred to the letter in *Marina Point* (*supra*, 30 Cal.3d at p. 734).

After further analysis, we cannot regard the letter as persuasive evidence of a legislative intention to treat our "arbitrary discrimination" language as if it were part of the statute. First, the letter is the statement of but one member of the Legislature. There is no evidence that it formed a part of the discussion or debate on the 1974 legislation, that it was made part of the legislative record, or even that it was communicated to other legislators. Under the standards we have established, the letter cannot fairly be regarded as a statement of legislative intent. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 701

In light of these principles, the Unruh Act is best understood by considering what the Legislature has actually done in response to our decisions. Notwithstanding our language about "arbitrary discrimination" and "stereotypes," the Legislature has continued to pay close attention to the specified categories of discrimination in the Unruh Act. As observed above, it expanded the scope of the Act after *Cox* by adding "sex" in 1974 and "blindness and physical disability" in 1987 as additional prohibited classifications. Following our decisions in *Marina Point, supra,* and *O'Connor, supra,* the Legislature quickly enacted legislation to confirm and codify our holdings as applied to housing discrimination against families with children, but also to clarify those holdings insofar as they applied to senior citizens' housing. (§§ 51.2, 51.3; Stats. 1984, ch. 787, § 1, p. 2781; Stats. 1984, ch. 1333, § 1, pp. 4681-4682; see also Civ. Code, § 51.4; Stats. 1989, ch. 501, § 2, No. 4 Deering's Adv. Legis. Service, pp. 1555-1556 [enacting "time-limited exception" to design requirements for senior housing in light of federal law and *Marina Point*].) Finally, although the Legislature made no change in the Act in direct response to our broad language concerning "arbitrary" distinctions, it did not alter or repeal the second sentence of section 51 (which states that the statute confers no right or privilege applicable alike to all persons regardless of race, sex, religion, etc.) in response to our conclusion that it was "obscure" in its meaning. (*Marina Point, supra,*

---

[170 Cal.Rptr. 817, 621 P.2d 856] ["In addition to the lack of assurance that anyone shared the legislator's view . . . there is the concern that letters such as those sent to the Governor on the question of signing the bill may never have been exposed to public view so that those will differing opinions as to the bill's meaning and scope had an opportunity to present their views also."]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371].)

Second, the letter is contradicted by evidence of at least equal, if not greater, probative value. When the Legislature amended the Act in 1987 to include "blindness or other disability" among the listed categories, the Legislative Counsel's digest of the bill stated in part: "This bill would include blindness or other physical disability within the bases of discrimination prohibited by these general civil rights provisions . . . ." No mention was made of our decisions in *Cox* or *Marina Point* or the "arbitrariness" of the newly listed classifications. We have previously ascribed to the Legislature the intentions expressed in the Legislative's Counsel's Digest of a statutory amendment. (*People v. Superior Court (Douglass)* (1979) 24 Cal.3d 428, 434 [155 Cal.Rptr. 704, 595 P.2d 139].)

Third, even if it were properly considered, the letter is a purported expression of legislative intent 15 years after the passage of the Unruh Act. As such, it does not constitute a binding declaration of the intent of the Legislature that enacted the statute. (*California Emp. etc. Com. v. Payne* (1947) 31 Cal.2d 210, 213-214 [187 P.2d 702]; *Del Costello v. State of California* (1982) 135 Cal.App.3d 887, 893, fn. 8 [185 Cal.Rptr. 582] ["The Legislature has no authority to interpret a statute. That is a judicial task."].) As in *California Emp. etc. Comm.,* any persuasive effect the letter might have is diminished by our inability to "accept the legislative statement that an unmistakable change in the statute is nothing more than a clarification and restatement of its original terms." (31 Cal.2d at p. 214.)

Finally, even if we were to accept the letter as persuasive evidence of Legislative intent, it would not change our analysis or the outcome of this case. As we explain below, we do not regard the landlord's minimum income policy, which is rationally calculated to foster a legitimate, nondiscriminatory business interest, as an "arbitrary" standard of tenant selection.

30 Cal.3d at p. 733.) Instead, it has continued to add the additional prohibited categories of discrimination to that sentence. Thus, the Legislature's continued emphasis on the specified categories of discrimination in the Act (without adding the words "arbitrary," "unreasonable," or similar language to its provisions) reflects the continued importance of those categories in its proper interpretation.

As in any case of statutory interpretation, our task is to determine afresh the intent of the Legislature by construing in context the language of the statute. (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 724; *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1010 [239 Cal.Rptr. 656, 741 P.2d 154].) Therefore, we will now consider the problem before us in light of both the language and history of the Act and the probable impact on its enforcement of the competing interpretations urged on us by the parties.

b. *The Language of the Statute*

In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose, i.e., the object to be achieved and the evil to be prevented by the legislation. (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 124 [253 Cal.Rptr. 1, 763 P.2d 852]; *People* v. *Jeffers* (1987) 43 Cal.3d 984, 997 [239 Cal.Rptr. 886, 741 P.2d 1127]; *Steinberg* v. *Amplica, Inc.* (1986) 42 Cal.3d 1198, 1205 [233 Cal.Rptr. 249, 729 P.2d 683].) As we have explained, were we writing on a clean slate, the repeated emphasis in the language of sections 51 and 52 on the specified classifications of race, sex, religion, etc., would represent a highly persuasive, if not dispositive, factor in our construction of the Act. (*Kizer* v. *Hanna* (1989) 48 Cal.3d 1, 8 [255 Cal.Rptr. 412, 767 P.2d 679] ["If a statute's language is clear, then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs."].) Indeed, plaintiffs' argument in favor of an additional classification of "economic discrimination" would effectively discard the listed classifications as surplusage in violation of the mandate to attribute significance to "every word and phrase" used by the Legislature. However, in view of our prior decisions and the Legislature's sometimes equivocal reactions to them, we will also consider other relevant factors in construing the Unruh Act as it applies in this case.

Among the maxims of jurisprudence in the Civil Code is the following: "Particular expressions qualify those which are general." (§ 3534 [enacted 1872].) The principle is an expression of the doctrine of *ejusdem generis* (or Lord Tenterden's rule), which seeks to ascertain common characteristics among things of the same kind, class, or nature when they are cataloged in legislative enactments. (*Lawrence* v. *Walzer & Gabrielson*

(1989) 207 Cal.App.3d 1501, 1506 [245 Cal.Rptr. 717]; *Martin* v. *Holiday Inns, Inc.* (1988) 199 Cal.App.3d 1434, 1437 [245 Cal.Rptr. 717].) *Ejusdem generis* is illustrative of the more general legal maxim *nocitur a sociis* —"it is known from its associates." (199 Cal.App.3d at p. 1437.)

The principle of *ejusdem generis* holds that " 'where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. [It] is based on the obvious reason that if the [writer] had intended the general words to be used in their unrestricted sense, [he or she] would not have mentioned the particular things or classes of things which would in that event become mere surplusage.' " (*Lawrence* v. *Walzer & Gabrielson, supra,* 207 Cal.App.3d at p. 1506, quoting *Scally* v. *Pacific Gas & Electric Co.* (1972) 23 Cal.App.3d 806, 819 [100 Cal.Rptr. 501].)[7]

 *Ejusdem generis* aids our interpretation of the Unruh Act in this case. In particular, it allows us to reconcile the plain language of the statute, including its listed discriminatory classifications, with the holdings of our prior cases and the Legislature's actions and reactions to our decisions.

In section 51, the Act refers to the freedom and equality of all persons and then illustrates the reference with the specific categories of race, color, religion, etc. As we have noted, the particular importance of these categories in interpreting the scope of the Act is underscored by their repetition in the proviso to section 51 that no right or privilege is conferred "which is applicable alike to persons" within the specified categories. The categories are referred to again in section 52 when the mode of enforcing the law is prescribed. In order to give significance to the Legislature's specific and repeated emphasis on these categories, we must ascertain their common element. The categories involve personal as opposed to economic characteristics—a person's geographical origin, physical attributes, and personal beliefs. Conspicuously absent from the list is any reference to financial or economic status, although the Legislature could not have been unaware throughout the history of the Unruh Act that businesses make charges for goods and services and impose financial conditions on access to their establishments.[8]

---

[7] *Ejusdem generis* applies whether specific words follow general words in a statute or vice versa. In either event, the general term or category is "restricted to those things that are similar to those which are enumerated specifically." (*Martin* v. *Holiday Inns, Inc., supra,* 199 Cal.App.3d at p. 1437; 2A Sutherland, Statutory Construction (4th ed. 1984) Intrinsic Aids, § 47.17, p. 166.)

[8] The dissent assails us for misusing the canon of *ejusdem generis* by "narrowing alternative provisions which the Legislature has adopted with the purpose of affording added safeguards" (citing *United States* v. *Gilliland* (1940) 312 U.S. 86, 93 [85 L.Ed. 598, 603-604, 61

The Legislature's decision to enumerate personal characteristics, while conspicuously omitting financial or economic ones, strongly suggests a limitation on the scope of the Unruh Act.[9] (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 3 [241 Cal.Rptr. 67, 743 P.2d 1323] [" '[T]he expression of certain things in a statute necessarily involves exclusion of other things not expressed.' "].) The California cases also support the limitation. When courts have applied the Act to arbitrary discrimination beyond the listed categories of race, sex, religion, etc., personal characteristics and not financial status or capability provided the basis of decision. In *Cox* (*supra*, 3 Cal. 3d 205), the arbitrary discrimination was directed against the unconventional dress and physical appearance of petitioner's companion. In *Marina Point* (*supra*, 30 Cal.3d 721) and *O'Connor* (*supra*, 33 Cal.3d 790), its object was the presence of children in apartments and condominiums. In other cases, it purpose was to exclude persons based on homosexuality. (See, e.g., *Rolon* v. *Kulwitzky, supra,* 153 Cal.App.3d at p. 292.)

The parties have cited no case nor has our research disclosed any in which distinctions based on financial or economic status (as opposed to personal characteristics) have been subjected to scrutiny under the Act. Although most states have public accommodations statutes similar to the Unruh Act and comparable federal legislation has also been enacted, there appears to be no case law from any jurisdiction supporting the proposition that economic distinctions are proscribed.[10] In sum, there is no support in

---

S.Ct. 518]). Its position lacks any foundation in the language of the Unruh Act. There is no "alternative provision" in the Act that was designed by the Legislature to safeguard plaintiffs from having to meet a minimum income criterion to qualify to rent an apartment from defendants. Unable to quote any such provision, the dissent relies exclusively on the broad language in our prior cases. As we have noted, the Legislature has neither codified nor specifically endorsed that language. Nor is there any suggestion in the history of the Act that the Legislature intended to include within its scope the realm of credit transactions and financial conditions applicable to rental housing, subjects it has dealt with in more specific legislation. Finally, contrary to the dissent's suggestion, we have been aided, but not controlled, by the canon of *ejusdem generis*. Numerous other factors support our interpretation of the Act.

[9] In addition to representing personal characteristics, the categories listed in the Act are also the subject of large bodies of statutory and constitutional law on both state and federal levels designed to protect classes of persons who have achieved historical recognition as distinct objects of adverse treatment by public and private entities, e.g., Blacks, Hispanics, and women. Plaintiffs have cited no federal or state constitutional or statutory provision (nor are we aware of any) that would place financial or economic status on the same footing with the specified categories of discrimination the Legislature has chosen to include in the Unruh Act. (See *San Antonio School District* v. *Rodriguez* (1972) 411 U.S. 1, 28-29 [36 L.Ed.2d 16, 40, 93 S.Ct. 1278] [observing that discrimination based on wealth does not possess the traditional indicia of a suspect classification under equal protection clause analysis and has not been treated as such by the Supreme Court].)

[10] (See 42 U.S.C. §§ 2000a to 2000a-6 [tit. II of the Civil Rights Act of 1964]; Note, *supra*, 7 N.Y.U. Rev. L. & Soc. Change at pp. 224-225 [classifications covered by tit. II include race, color, religion, and national origin] & pp. 260-273 [listing classifications covered by the 38

the language or history of the Unruh Act for plaintiffs' contention that economic distinctions and criteria are within its scope.

### c. *Legitimate Business Interest*

While emphasizing personal characteristics in finding arbitrary discrimination, the California appellate cases have also recognized that legitimate business interests may justify limitations on consumer access to public accommodations. (See, e.g., *Cox, supra,* 3 Cal.3d at p. 217 ["A business establishment may, of course, promulgate reasonable deportment regulations that are rationally related to the services performed and the facilities provided."]; *Frantz* v. *Blackwell* (1987) 189 Cal.App.3d 91, 95-96 [234 Cal.Rptr. 178] [refusal to sell house to speculator in potential competition with defendant did not violate the Act]; *Reilly* v. *Stroh* (1984) 161 Cal.App.3d 47, 53 [207 Cal.Rptr. 250] [segregation of persons under 21 in restaurant not arbitrary in view of legal requirements imposed on proprietor relating to consumption of alcoholic beverages by minors]; *Ross* v. *Forest Lawn Memorial Park* (1984) 153 Cal.App.3d 988, 992-993 [203 Cal.Rptr. 468, 42 A.L.R.4th 1049] [cemetery's policy of private funerals that excluded "punk rockers" did not violate the Act]; *Wynn* v. *Monterey Club* (1980) 111 Cal.App.3d 789, 798 [168 Cal.Rptr. 878] [agreement to bar from gambling establishment a pathological gambler who had written bad checks was "good business and social practice" that did not violate the Act].) In each case, the particular business interests of the purveyor in maintaining order, complying with legal requirements, and protecting a business reputation or investment were recognized as sufficient to justify distinctions among its customers.

Business establishments have an obvious and important interest in obtaining full and timely payment for the goods and services they provide.

public accommodations statutes of the states and D.C. as of 1978].) As the author of the note observes, state legislatures have occasionally added "innovative and controversial" categories to their public accommodations statutes that go beyond the traditional ones of race, sex, religion, and national origin. (*Id.* at p. 261.) Again, the examples relate almost exclusively to personal, as opposed to economic, characteristics and attributes such as personal appearance, sexual orientation, family responsibilities, residence, and political affiliation.

The only exception appears to be a Massachusetts statute that cryptically prohibits discrimination based on "class." (*Id.* at p. 272; Mass. Gen. Laws Ann. ch. 272, § 92A.) As the author of the Note observes: "The potential implications of [the Massachusetts] provision are profound, but it is difficult to determine what the drafters intended by the inclusion of the classification." (Note, *supra,* at p. 272.) No Massachusetts case has adopted an interpretation of its statute that would support plaintiffs' argument here. (To the contrary, see *Hennessey* v. *Berger* (1988) 403 Mass. 648 [531 N.E.2d 1268, 1271] [declining to apply the statute to the conduct of a physician who refused a Medicare patient].) In any event, whatever its significance, the Massachusetts addition of "class" to the categories of prohibited discrimination came by specific action of its Legislature, not by a court decision expanding the parameters of the judicially coined phrase "arbitrary discrimination."

Indeed, in the absence of a subsidy, prompt receipt of payment is generally vital to the continuation of a business enterprise and the public accommodation it provides. There is no serious question that a business may, without violating the Unruh Act, charge a stated price for goods or services and demand payment in advance. Thus, in *Orloff* v. *Hollywood Turf Club, supra*, 110 Cal.App.3d 340, the Court of Appeal stated: "It is at once apparent that under the provisions of section 51 and 52 of the Civil Code if a charge is made for admission to a race track, equally applicable to all citizens, [such] a failure or refusal by a citizen to pay such charge does not create a liability under the statute. It is the privilege of an inn, a railroad or a race track to demand, in advance, pay for the accommodation, facility or the privilege to be rendered. Hence, a failure of a person to comply therewith is not a refusal of any equal accommodation, facility or privilege accorded to those who comply. The statute expressly provides that the equality called for by the statute is subject 'to the conditions and limitations established by law, and applicable alike to all citizens.' Among such conditions and limitations applicable to all citizens is that they shall pay the charges imposed, equally and without discrimination, upon all citizens." (110 Cal.App.2d at pp. 342-343.) Because the plaintiff in *Orloff* had not paid the stated charge and obtained a ticket allowing his admission to the racetrack, he had no cause of action under the predecessor to the Act.

Similarly, in *Koire* v. *Metro Car Wash* (1985) 40 Cal.3d 24 [219 Cal.Rptr. 133, 707 P.2d 195], we recognized that the Unruh Act did not prohibit businesses from making economic distinctions among customers so long as the criteria used were not based on personal characteristics and could conceivably be met by any customer. Holding that a discount based on sex violated the Act, we observed that other kinds of discounts based on quantity, advance reservations, time of purchase or other conditions "which any patron could satisfy" were "clearly permissible." (*Id.* at p. 36.)

The minimum income policy is no different in its purpose or effect from stated price or payment terms. Like those terms, it seeks to obtain for a business establishment the benefit of its bargain with the consumer: full payment of the price. In pursuit of the objective of securing payment, a landlord has a legitimate and direct economic interest in the income level of prospective tenants, as opposed to their sex, race, religion, or other personal beliefs or characteristics. For nearly all tenants, current income is the source of the monthly rental payment. When a tenant ceases paying rent during the term of the tenancy, the landlord must resort to legal process to obtain possession of the premises and to collect any back rent that may be due. (§ 1952.3; Code Civ. Proc., § 1159 et seq.)

Even with the use of summary unlawful detainer proceedings, an eviction may take several months, during which the tenant remains in possession,

enjoying the benefits of the leasehold without paying rent. (See Cal. Residential Landlord-Tenant Practice (Cont.Ed.Bar 1986) § 4.50, p. 258 [noting that delays may postpone an eviction "for weeks or months"].) Thus, the landlord bears the economic burdens (what an economist might call the "transaction costs of default") resulting from: (1) loss of income from default to eviction; (2) administrative time and the legal and other expenses incurred in the eviction process; and (3) the delays and expense of collection of back rent from the tenant, as well as the risk of noncollection.

In order to minimize the transaction costs of default, the economically rational landlord might adopt one or more of several approaches. First, a landlord might simply charge higher rents to all tenants to absorb the additional expense. Such a policy, of course, contains its own element of arbitrariness because it penalizes the majority of tenants who pay their rent on a regular basis. Moreover, the charging of higher rents as a means of subsidizing defaults necessarily excludes even more low income persons from tenancy. Second, a landlord might require larger amounts from all tenants as advance rent or security deposits. This policy, too, imposes additional burdens on the paying tenants. In apparent recognition of this fact, it is also subject to statutory limitations on the amount of advance payment a landlord may demand. (§ 1950.5.) Third, a landlord might adopt one or more policies or practices designed to screen out prospective tenants who are likely to default.

The minimum income policy adopted by defendants is, of course, an example of the third approach. It assumes that, at some ratio of rent to income, the burden of paying rent, along with other living expenses, will impose a hardship on a tenant, resulting in default. Although there may be myriad of individual factors operating in cases of particular prospective tenants that might affect the predictive value of the ratio, it does not thereby become "arbitrary" in the same way that race and sex discrimination are arbitrary. On the contrary, it is based on the rational economic interest of the landlord to minimize defaults and maintain the solvency of its business establishment, while extending the opportunity for rental housing to all persons regardless of race, sex, religion, etc.[11]

---

[11] The assumption underlying the minimum income policy is also supported by legislative declaration. Sections 50052.5 and 50053 of the Health and Safety Code define the terms "affordable housing cost" and "affordable rent" for a variety of purposes, including the establishment of standards for government sponsored and assisted housing in this state. (E.g., Health & Saf. Code, §§ 50462, subd. (c), 50888.3, 50951, 51264.) Those sections specify that an "affordable" rent or housing cost does not exceed 25 percent of gross income. (See also Gov. Code, § 54236, subd. (g) [providing similar definition in reference to priorities for disposing of surplus property owned by public agencies]; Health & Saf. Code, § 50781, subd. (a) [defining "affordable" in reference to mobilehome parks as not more than 30 percent of monthly income].) The extensive use of the 25 percent figure as a goal of state housing policy

Seizing again on the general concepts of "arbitrary discrimination" and "reasonable" regulations referred to in the language of *Cox* and other cases (e.g., 3 Cal.3d at p. 217), plaintiffs argue those concepts inevitably involve fact-bound determinations requiring trial as opposed to legal issues cognizable on demurrer. Plaintiffs' argument is not supported by the case law decided under the Act. Unruh Act issues have often been decided as questions of law on demurrer or summary judgment when the policy or practice of a business establishment is valid on its face because it bears a reasonable relation to commercial objectives appropriate to an enterprise serving the public. (See, e.g., *Frantz* v. *Blackwell, supra,* 189 Cal.App.3d at pp. 95-96 [refusal to deal with real estate speculator upheld on demurrer]; *Ross* v. *Forest Lawn Memorial Park, supra,* 153 Cal.App.3d at pp. 992-993 [private funeral policy evaluated as question of law on demurrer]; *Wynn* v. *Monterey Club, supra,* 111 Cal.App.3d at pp. 796-797 [legality of agreement to bar compulsive gambler from gambling house treated as question of law on motion for summary judgment]; *Newby* v. *Alto Riviera Apts.* (1976) 60 Cal.App.3d 288, 301-302 [131 Cal.Rptr. 547] [eviction of tenant attempting to organize a rent strike upheld as a matter of law on motion for nonsuit].) For the reasons expressed, the minimum income policy deserves "legal issue" treatment.

d. *The Consequences of Allowing Claims for Economic Discrimination*

Proceeding from a broader concept of arbitrariness than any decision has thus far endorsed, plaintiffs maintain that use of a minimum income policy is arbitrary because it declines to treat them as individuals and "stereotypes" them as being low income and unable to pay rent. According to plaintiffs, landlords are required by the Unruh Act to make individualized determinations of each prospective tenant's ability to pay rent without the use of a minimum income policy that screens out a particular group of persons based on income.

 When uncertainty arises in a question of statutory interpretation, consideration must be given to the consequences that will flow from a particular interpretation. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.) In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed

---

in different contexts implies that when housing costs for individuals and families substantially exceed 25 percent of their income, housing is no longer affordable according to state guidelines. The landlord's policy at issue here assumes that a rent of more than 33⅓ percent of gross income is not within the tenant's means and invites default. Measured against the state's 25 percent standard for affordable housing, such a policy is neither arbitrary nor irrational.

purpose, not absurd consequences. (*People* v. *Jeffers, supra,* 43 Cal.3d at p. 997; *In re Head* (1986) 42 Cal.3d 223, 232 [228 Cal.Rptr. 184, 721 P.2d 65].) " '[W]here the language of a statutory provision is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted.' " (*In re Eric J.* (1979) 25 Cal.3d 522, 537 [159 Cal.Rptr. 317, 601 P.2d 549].) We perceive two significant adverse consequences that would likely follow from plaintiffs' proposed interpretation of the Act.

First, plaintiffs' view of the Act would involve the courts of this state in a multitude of microeconomic decisions we are ill equipped to make. The parties agree defendants have a legitimate interest in screening out tenants who are unable to pay rent regularly and on time throughout the tenancy. Defendants maintain the minimum income policy is reasonably calculated to protect that interest; plaintiffs contend the Act requires defendants to evaluate each prospective tenant's ability to pay rent utilizing relevant facts such as prior rental history. Thus, the parties differ primarily with respect to what criteria should be used (and in what combinations and permutations) to screen out persons who are likely to default. Plaintiffs appear to favor payment history; defendants favor income.

A trial in such a case would explore issues such as what general tenant selection criteria are the best predictors of default; what weight should be given to each criterion; what threshold criteria, if any, are permissible; and what must be shown and by whom to validate general or threshold criteria. The trial would devolve into a battle of economic studies and experts, with each side arguing from statistical and other evidence in support of its favorite criteria. And the outcome would be of little value to the parties (because the various economic factors involved are subject to constant change) or to anyone else (because the fact-specific decision would not allow other landlords or tenants to predict what minimum income policy, if any, would pass muster). Indeed, the issue of what criteria could be used by landlords could be tried and retried across the state as an issue of fact, with no prospect of certainty or stability in the respective rights and duties of the parties.

As one law review commentator has stated: "Since at some level an income standard will be perfectly predictive of ability to pay, courts will essentially be asked to choose among different percentages. Evaluating landlord investment decisions made in a complex metropolitan housing market is a task to which the courts bring no special expertise . . . . Even if a court could ignore possible collateral consequences, such as increased housing prices for lower income groups, . . . [judicial establishment of tenant suitability criteria] involves an expanded and onerous role for the judiciary in

the private housing market that should not be assumed without further . . . [legislative] direction." (Comment (1975), 88 Harv.L.Rev. 1631, 1642-1643, fns. omitted.)

Moreover, as defendants' amici curiae suggest and the dissenting opinion confirms, plaintiffs' argument is not readily confined to landlords and tenants. Many other businesses, including lending institutions and retail and wholesale sellers, are in the position of extending money, goods, or services in exchange for promises to pay or repay in the future. They use minimum income policies as well as other financial criteria to make risk-oriented decisions regarding what customers to deal with and on what terms. These businesses, as well as others, could be subjected to legal challenges to their policies based on summary allegations that they had acted "arbitrarily." Plaintiffs' approach would require that each business defend its policies as "reasonable" in a trial on the merits.[12] Those trials, like the one plaintiffs propose here, would generate expense and uncertainty on a massive scale with little or no demonstrable benefit to the antidiscrimination policy of the Unruh Act.[13]

For these reasons, the economics of credit practices, whether those of landlords or other businesses, have traditionally been left to the guidance of market forces or to specific legislative and administrative action designed to address particular grievances. (See, e.g., § 1950.5 [limiting tenant security deposits to two months' rent]; the Equal Credit Opportunity Act, 15 U.S.C.

---

[12] Indeed, in the logic of plaintiffs' argument, there is no distinction between financial criteria used to select tenants and the amount of rent charged by the landlord. Under particular circumstances, both might be labeled "arbitrary" or "unreasonable" restrictions on access to business establishments. Thus, the logical result of plaintiffs' argument is economic regulation on a vast scale, amounting to judicial price and rent control.

[13] Plaintiffs argue that the Unruh Act, as a codification of the common law equal access doctrine (see *In re Cox, supra,* 3 Cal.3d at pp. 212-213), requires us to ignore the classifications listed in the Act and to interpret it to afford every person the right to challenge as "arbitrary" the economic polices and practices of business establishments. Plaintiffs supply us with no authority supporting the proposition that the common law doctrine extends this far. To the contrary, one of the scholarly commentaries cited in *Cox*'s description of the common law doctrine specifically warns against judicial intervention in pricing polices for the same reasons we have relied on. (Hamilton, *Affectation With Public Interest* (1930) 39 Yale L.J. 1089, cited in *Cox, supra,* at 3 Cal.3d at p. 212.) As the author observed: "In subjecting the price structure of an industry to control, the division of labor between the legislature and the court seems clearly marked. The discretion must belong to the law-making body, a restrained power of review to the judiciary. To the primary question of the necessity for regulation, the courts cannot easily give a right answer. Their crowded dockets allow scant time for a consideration of matters of policy; the procedure of hearings and briefs does not guarantee that the significant issues will be adequately presented; it is difficult for members of the bench to conduct independent investigations. The questions which focus about need, a scheme of control, and expected performance are very intricate and highly technical. The role of the bench, if it is to be wisely constructive, must be one of studied tolerance." (39 Yale L.J. at p. 1111.) There is no support in the common law for the position urged by plaintiffs.

§ 1691 et seq. [prohibiting credit discrimination on specified grounds and creating an administrative regulatory and enforcement scheme];[14] § 1812.30 et seq. [prohibiting denial of credit based on marital status].) In the absence of clear legislative direction, which the general antidiscrimination provisions of the Unruh Act do not provide, we are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking. (See *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 694, fn. 31 [254 Cal.Rptr. 211, 765 P.2d 373].)[15]

Second, requiring so-called individualized determinations of the kind proposed by plaintiffs may have pernicious effects on the antidiscrimination policy of the Unruh Act itself. The Act serves to guarantee access to public accommodations on the part of all persons regardless of race, sex, religion, or other characteristics that have no bearing on a person's status as a responsible consumer. A minimum income policy is neutral with respect to these characteristics. Any person having the specified income level has met this qualification to rent an apartment. Business establishments seeking to comply with antidiscrimination laws are often directed to adopt and apply consistently neutral criteria (such as the minimum income policy) as a means to avoid invidious discrimination in fact as well as in appearance. (See, e.g., Cal. Residential Landlord-Tenant Practice, *supra*, § 2.5, at pp. 78-79 ["The landlord's use of valid, objective selection factors applied in a

[14] The dissent points to 15 United States Code section 1691(a) of the Equal Credit Opportunity Act in support of its argument that discrimination against the poor violates the Unruh Act. Unlike the Unruh Act, however, this federal act specifically declares unlawful discrimination against a credit applicant "because all or part of the applicant's income derives from any public assistance program." (15 U.S.C. § 1691(a)(2).) It also recognizes the complexity of controlling credit transactions by providing for extensive administrative rulemaking and regulation. (15 U.S.C. § 1691b.) Even more critically, the Equal Credit Opportunity Act does not support the dissent's position on the merits of this case. It provides in part that it is not discrimination for a creditor "to make an inquiry . . . whether the applicant's income derives from any public assistance program if such inquiry is for the purpose of determining the amount and probable continuance of income levels, credit history, or other pertinent element of credit worthiness as provided in regulations of the Board [of Governors of the Federal Reserve System]." (15 U.S.C. § 1691(b)(2).) The applicable regulation provides in part that a creditor "may consider the amount and probable continuance of any income in evaluating an applicant's creditworthiness." (12 C.F.R. § 202.6(b)(5).) Viewed as a credit standard, the minimum income policy does no more than this and would pass muster under the Equal Protection Opportunity Act, if it were applicable.

[15] We have frequently noted the inappropriateness of judicial intervention in complex areas of economic policy in other contexts. (E.g., *County Sanitation Dist. No. 2* v. *Los Angeles County Employees' Assn.* (1985) 38 Cal.3d 564, 591, fn. 39 [214 Cal.Rptr. 424, 699 P.2d 835] [economic policy questions involved in public employee strikes were "highly debatable" and "best left to the legislative branch in the first instance"; opn. by Broussard, J.]; *Wholesale T. Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634, 647 [82 P.2d 3, 118 A.L.R. 486] [upholding the Unfair Practices Act: "It is primarily a legislative and not a judicial function to determine economic policy."]; see also *Max Factor & Co.* v. *Kunsman* (1936) 5 Cal.2d 446, 454-456 [55 P.2d 177].)

uniform and nondiscriminatory manner is the best means of avoiding challenges to a tenant-selection procedure . . . . *The absence of objective criteria itself can be important evidence supporting a finding of racial discrimination.*" (Italics added.)].)

Instead of encouraging landlords and other businesses to rely on criteria that are race- and sex-neutral in making business decisions, plaintiffs seek the opportunity to challenge such criteria in court on a case-by-case basis, thereby inducing landlords to abandon such criteria in favor of subjective, individualized decisions. And yet, such evaluations, unguided by neutral criteria announced in advance and applied consistently, may serve to disguise and thereby promote the very kinds of invidious discrimination based on race, sex, and other personal traits that the Unruh Act prohibits. Thus, contrary to plaintiffs' argument, we perceive that a plethora of "economic discrimination" suits would inhibit rather than enhance the fundamental purpose of the Unruh Act: to secure to all persons equal access to public accommodations "no matter what their race, color, religion, ancestry, national origin, or blindness or other physical disability." (§ 51.)

Plaintiffs and their amici curiae offer a variety of evidence pointing to a shortage of adequate housing for low income persons. As a matter of social policy, we could easily acknowledge the persuasive force of this evidence. The Legislature has done so. (Health & Saf. Code, § 50003 ["[T]here exists within urban and rural areas of the state a serious shortage of decent, safe, and sanitary housing which persons and families of low or moderate income, including elderly and handicapped, can afford. This situation presents an absolute present and future shortage of supply . . . ."].) As we have observed, our judicial task is limited to ascertaining the legal status of a claim of economic discrimination under a general civil rights statute prohibiting discrimination in public accommodations because of race, sex, religion, etc. That claim has no merit.

In summary, we hold that defendant's minimum income policy does not violate the Unruh Act. The policy does not make distinctions among persons based on the classifications listed in the Act (e.g., race, sex, religion, etc.) or similar personal traits, beliefs, or characteristics that bear no relationship to the responsibilities of consumers of public accommodations. It is a financial criterion of customer selection that applies uniformly and neutrally to all persons regardless of personal characteristics. Moreover, on its face, it makes permissible distinctions among persons that are justified by the landlord's legitimate business interest in assessing the capability of prospective tenants to pay rent on a continuing basis. As such, it does not offend the language, policy, or purpose of the Act.

### 4. *Sex Discrimination Based on Disparate Impact on Women*

■■■ In a separate cause of action in their first amended complaint, plaintiffs allege defendants' minimum income policy constitutes sex discrimination because of an alleged disparate impact of the policy on women. Plaintiffs make the following central allegations: Plaintiffs are female heads of low income families whose sole income is derived from public assistance. A disproportionate number of families receiving public assistance are headed by women. Women generally have lower average incomes than men. Defendants' minimum income policy "excludes a disproportionate number of female-headed households from the pool of applicants to whom defendants will rent units, since a statistically significant greater number of families headed by women are adversely impacted by defendants' policies than families headed by men." The Court of Appeal rejected plaintiffs' sex discrimination claim, holding that a disparate or adverse impact test does not apply in cases brought under the Unruh Act.[16]

■■■ As developed in federal law, the disparate impact test allows a plaintiff in certain contexts to establish a prima facie case of discrimination by showing that a defendant's policies or practices have an adverse impact on a statutorily protected class of persons such as women, Blacks, Hispanics, etc. The test originated in *Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424 [28 L.Ed.2d 158, 91 S.Ct. 849], a case arising under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2), which prohibits discrimination in employment. The United States Supreme Court held that a title VII plaintiff may prove that a facially neutral employment practice nonetheless *actually*

---

[16] Consistent with the applicable rules of pleading, we adopt a liberal construction of plaintiffs' first amended complaint, drawing all reasonable inferences in favor of their allegations. (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 945, p. 379; *Beck* v. *County of San Mateo* (1984) 154 Cal.App.3d 374, 379 [201 Cal.Rptr. 365].) Based on at least one interpretation of plaintiffs' allegations, however, they have not stated a cause of action even under a disparate impact theory. Plaintiffs affirmatively allege that women generally have lower incomes than men. To the extent this allegation is interpreted to mean that the reason for any disparate impact of defendants' policy on women is their relatively lower incomes, it concedes that the distinction is not based on sex, but on income level, a sex-neutral characteristic. As the Second Circuit observed in the similar context of a challenge to a minimum income policy based on its racial impact: "A businessman's differential treatment of different economic groups is not necessarily racial discrimination and is not made so because minorities are statistically overrepresented in the poorer economic groups . . . . [P]laintiffs would have to show that there existed some demonstrable prejudicial treatment of minorities over and above that which is the inevitable result of disparity in income." (*Boyd* v. *Lefrak Organization* (2d Cir. 1975) 509 F.2d 1110, 1113.) As we have indicated in the previous section, this kind of person-neutral economic distinction does not violate the Unruh Act. (See also *Barrett* v. *Lipscomb* (1987) 194 Cal.App.3d 1524, 1534 [240 Cal.Rptr. 336] [single-family residence covenants did not constitute age discrimination in violation of the Act because they were facially neutral and "[t]here [was] no language in the covenants to suggest that any age group is barred from residency"].)

*discriminates* because of its disproportionate negative impact on the particular protected class to which plaintiff belongs. (401 U.S. at pp. 431-432 [28 L.Ed.2d at p. 164].) The Supreme Court found the fundamental purpose of title VII to be "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." (401 U.S. at p. 431 [28 L.Ed.2d at p. 164].) As a result, it concluded: "Congress directed the thrust of [title VII] to the *consequences* of employment practices, not simply the motivation." (*Id*. p. 432 [28 L.Ed.2d at p. 165], italics in original.)

The disparate impact test continues to apply in employment discrimination cases under title VII. As the Supreme Court recently explained in *Wards Cove Packing Co., Inc.* v. *Atonio* (1989) 490 U.S. 642, 645-646 [104 L.Ed.2d 733, 744, 109 S.Ct. 2115, 2119]: "Under this basis for liability . . . a facially neutral employment practice may be deemed violative of Title VII without evidence of the employer's subjective intent to discriminate that is required in a 'disparate treatment' case." To establish a prima facie case under the disparate impact test, the plaintiff must show that the application of "a specific or particular employment practice" has created a disparate impact on a statutorily protected class. (*Id*. at p. 657 [104 L.Ed.2d at p. 751, 109 S.Ct. at p. 2124].) In this regard, the relevant statistical comparison is between the representation of the protected class in the employer's work force and in the *qualified* population in the labor force, unless the plaintiff can establish that the dearth of unqualified persons was due to the employer's practices. (*Id*. at p. 651, fn. 7 [104 L.Ed.2d at p. 748, 109 S.Ct. at pp. 2121-2122], italics added.)

If a prima facie case is established, the burden of producing evidence shifts to the employer, who must articulate a substantial business justification for the challenged practice. The burden of persuasion remains on the plaintiff. If the plaintiff is unable to persuade the trier of fact that the defendant's business justification is insubstantial, the defendant will prevail unless the plaintiff establishes pretext, i.e., that other employee selection methods or policies of lesser adverse impact would also serve the defendant's legitimate interests. (490 U.S. at pp. 656-661 [104 L.Ed.2d at pp. 750-754, 109 S.Ct. at pp. 2124-2127].)

The disparate impact test has been applied by California appellate courts in analyzing employment discrimination claims under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), California's counterpart to title VII. (*Ibarbia* v. *Regents of University of California* (1987) 191 Cal.App.3d 1318 [237 Cal.Rptr. 92]; *City and County of San Francisco* v. *Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976,

985-986 [236 Cal.Rptr. 716].) No case has extended the test to the Unruh Act.

■■■■ Plaintiffs urge that extension of a disparate impact test to claims under the Unruh Act is necessary to further the purpose of the Act to combat arbitrary discrimination in public accommodations. They also contend that analogous federal precedent justifies the adoption of the test in Unruh Act cases. We disagree.

Initially, plaintiffs point to nothing in the language or history of the Unruh Act that would suggest the Legislature intended the use of such a test. As noted above, the Act was passed in 1959 and its predecessor in 1897, long before the disparate impact theory was recognized by the federal courts. On the contrary, the language of the Act suggests that *intentional acts of discrimination*, not disparate impact, was the object of the legislation. Section 52 states: "Whoever *denies*, or who *aids*, or *incites* such denial, or whoever *makes any discrimination*, distinction, or restriction on account of sex, color, race . . . contrary to the provisions of section 51 . . . , is liable for each and every such *offense* for the actual damages, *and* such amount as may be determined by a jury, or a court sitting without a jury, *up to a maximum of three times the amount of actual damage* but in no case less than two hundred fifty dollars ($250), and such attorney's fees as may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51 . . . ." (Italics added.)

Several aspects of the foregoing language point to an emphasis on intentional discrimination. The references to "aiding" and "inciting" denial of access to public accommodations, to making discriminations and restrictions, and to the commission of an "offense" imply willful, affirmative misconduct on the part of those who violate the Act. Moreover, the damages provision allowing for an exemplary award of up to treble the actual damages suffered with a stated minimum amount reveals a desire to punish intentional and morally offensive conduct. In contrast, title VII of the Civil Rights Act does not allow recovery of compensatory or punitive damages, but confines the plaintiff to specified forms of equitable relief. (*White* v. *Washington Public Power Supply System* (9th Cir. 1982) 692 F.2d 1286, 1290; *Richerson* v. *Jones* (3d Cir. 1977) 551 F.2d 918, 926-927; *Robinson* v. *City of Lake Station* (N.D.Ind. 1986) 630 F.Supp. 1052, 1064.)

In addition, as we have noted, the Act explicitly exempts standards that are "applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability." (§ 51.) By its nature, an adverse impact claim challenges a standard that is applicable alike to all such persons based on the premise that, notwithstanding its

universal applicability, its actual impact demands scrutiny. If the Legislature had intended to include adverse impact claims, it would have omitted or at least qualified this language in section 51.

Plaintiffs also argue that the disparate impact test has been extended to title VIII of the Civil Rights Act, which deals with housing discrimination. The federal decisions, however, appear to be in conflict on the use of the test in title VIII cases, with some cases holding that an action against a private landlord cannot be maintained on allegations of mere disparate impact, and with others holding to the contrary. (*Brown* v. *Artery Organization, Inc.* (D.D.C. 1987) 654 F.Supp. 1106, 1114-1117 [discussing conflicting decisions from federal appellate courts, finding no controlling authority, and holding that proof of discriminatory intent is necessary to establish a prima facie case against a private landlord].)[17] Because of the conflict in the federal cases and the obvious differences in language and purpose between title VIII and the Unruh Act, title VIII cases are of little assistance in our task of statutory interpretation.[18]

As we have noted, the Unruh Act is not an isolated statute. It is part of a large body of legislation that has been enacted at the federal and state levels since the Supreme Court invalidated the original federal public accommodations statute in the *Civil Rights Cases, supra,* 109 U.S. 3. Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a(a)) also guarantees "full and equal access" to specified public accommodations and at least 38 states have public accommodations statutes that prohibit discrimination by business establishments against their customers. (Note, *supra,* 7 N.Y.U. Rev. L. & Soc. Change at pp. 219-226, 238-239, 272.) Yet, plaintiffs have cited no case (nor has our research disclosed any) in which a disparate impact test was used in applying any of these statutes.[19] In sum, plaintiffs have failed to

[17] The title VIII case most closely in point is *Boyd* v. *Lefrak Organization, supra,* 509 F.2d 1110, in which the Second Circuit rejected a claim that a landlord's policy that prospective tenants have weekly income of at least 90 percent of the monthly rent constituted race discrimination because of its adverse impact on members of minority groups who tended to be poorer than Whites.

[18] For example, one of the principal purposes of title VIII is to promote "open, integrated residential housing patterns" (*Otero* v. *New York Housing Authority* (2d Cir. 1973) 484 F.2d 1122, 1134). The Unruh Act does not share this purpose. Such an objective necessarily focuses enforcement more directly on effect and impact as distinct from intention to discriminate.

[19] Indeed, the language of these statutes, like that of the Act, strongly suggests that intentional discriminatory treatment, not disparate impact, was the evil the framers sought to eradicate. As one commentator summarized the essential elements of an offense under the pertinent legislation: "The basic violation of a public accommodations law is denial of full and equal services at a covered establishment. Such a denial occurs when there is discriminatory or abusive treatment, services, or charges. At present, complaints of insulting or discriminatory treatment intended to discourage certain customers are as common as complaints of outright refusals of entry. Exclusion and unequal treatment form the core of any public

support their argument for use of the disparate impact test with statutory language, history, or relevant authority.[20]

■■■ As the Court of Appeal stated in rejecting plaintiffs' claim based on disparate impact analysis: "We note that the *general* antidiscriminatory objectives of the Unruh Act are much broader than the *specific* antidiscrimination principles underlying titles VII and VIII. Those two federal laws, with their state FEHA counterparts, aim to eliminate discrimination solely in employment and housing as to enumerated classes of persons. They represent areas of special concern to Congress and the Legislature. It might well be more appropriate to single out those two areas for special attention. The Unruh Act, however, aims to eliminate arbitrary discrimination in the provision of *all* business services to all persons. Adoption of the disparate impact theory to cases under the Unruh Act would expose businesses to new liability and potential court regulation of their day-to-day practices in a manner never intended by the Legislature. This we decline to do." We agree with the summary and reasoning of the Court of Appeal and likewise decline to extend disparate impact analysis to Unruh Act claims.

■■■ We are aware that the Fair Employment and Housing Commission has expressed a different view. In *Department of Fair Employment and Housing* v. *Merribrook Apartments* (1988) FEHC Dec. No. 88-19, the commission ruled that an occupancy standard limiting two bedroom apartments to two occupants constituted intentional discrimination based on age in violation of the Government Code section 12948, which incorporates the Unruh Act. In the alternative, the commission found that the standard resulted in a proscribed disparate impact under the Act *and* the FEHA. One member of the five-person commission concurred in the decision, noting that consideration of disparate impact was unnecessary and therefore of no value as precedent.

The commission's decision, like plaintiffs' argument, is based on federal decisions under titles VII and VIII of the Civil Rights Act that are confined to employment and housing discrimination based on specified categories of

accommodations violation and are covered by all statutes." (Note, *supra*, 7 N.Y.U. Rev. L. & Soc. Change at p. 244.)

[20] Disparate impact tests are not uniformly used in federal antidiscrimination law. For example, the United States Supreme Court has declined to extend disparate impact analysis to the general antidiscrimination provisions in the Fifth and Fourteenth Amendments to the United States Constitution. (*Washington* v. *Davis* (1976) 426 U.S. 229, 246-248 [48 L.Ed.2d 597, 607, 96 S.Ct. 2040] [holding that disparate impact test does *not* apply and that proof of intentional discrimination is required in such cases].) In view of its broad scope, general language, and origins in post-Civil War civil rights legislation, the Unruh Act is more in the tradition of these constitutional amendments than the extensive and detailed regulatory provisions of titles VII and VIII of the Civil Rights Act of 1964. Those provisions are more analogous to the FEHA. We are not confronted with an FEHA claim in this case.

race, sex, religion, etc. It does not analyze the language or history of the Unruh Act, nor does it offer any reasoning or authority in the Act, as opposed to the FEHA or titles VII and VIII, which incorporate a disparate impact test. Insofar as the commission's statements are applicable to the Act, they represent an erroneous interpretation which we are not bound to follow. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra*, 43 Cal.3d at p. 1396 ["[A]n erroneous administrative construction does not govern the interpretation of a statute, even though the statute was subsequently reenacted without change."]; see also *Hutchinson* v. *Workers' Comp. Appeals Bd.* (1989) 209 Cal.App.3d 372, 379 [257 Cal.Rptr. 240].)

In summary, we hold that a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act. A disparate impact analysis or test does not apply to Unruh Act claims. In so holding, we do not preclude the admission of relevant evidence of disparate impact in Unruh Act cases on proper foundation and subject to the general rules of evidence. Because such evidence may be probative of intentional discrimination in some cases, a blanket rule of exclusion cannot be justified. In addition, we express no view as to whether a disparate or adverse impact test applies to housing, employment, or other discrimination claims under the FEHA or any other provision of law.

### 5. *Disposition*

The Court of Appeal incorrectly determined that plaintiffs' first amended complaint stated a cause of action for economic discrimination in violation of the Unruh Act. That portion of its judgment is reversed. However, it correctly upheld the dismissal of plaintiffs' purported cause of action for sex discrimination based on disparate impact. That portion of its judgment is affirmed.

Plaintiffs have not carried their burden of showing that the first amended complaint could be further modified to state a cause of action under the Act. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [703 P.2d 58].) We cannot conceive of any manner in which it could be so modified. Therefore, it appears that plaintiffs' claim is fatally defective under the relevant substantive law. On remand, the Court of Appeal shall direct the trial court to enter judgment dismissing plaintiffs' action. (*Heckendorn* v. *San Marino* (1986) 42 Cal.3d 481, 489 [229 Cal.Rptr. 324, 723 P.2d 64]; see also *Beck* v. *County of San Mateo, supra,* 154 Cal.App.3d at p. 379.)

Panelli, J., Kennard, J., Arabian, J., and Eagleson, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Committee.

**MOSK, J.,** Dissenting.—The majority hold, as a *matter of law*, that defendant's minimum income policy does not violate the Unruh Civil Rights Act. Upon reflection, however, I must agree in principle with Justice Broussard's dissent that plaintiffs here have pled a facially valid cause of action under the Unruh Act. Because there are *factual issues* unresolved, the issue could not be disposed of on demurrer.

As the Court of Appeal found, whether an announced policy is arbitrary or unreasonable is to be determined by a trier of fact. Is the three-times-rent criterion an accurate predictor of a tenant's ability to meet his or her financial obligations? Is the criterion customarily used in the financial industry and, if so, is it reasonable? Is the criterion appropriate in all parts of the state, or do the variations in income levels render it valid in some locales and arbitrary in others? These and other questions clearly require a factual determination.

Since the majority determine these and similar issues on demurrer as a matter of law, I believe they err and therefore dissent.

**BROUSSARD, J.,** Dissenting.—Until today, it was well established that the Unruh Civil Rights Act (Civ. Code, § 51 et seq.; hereafter the Unruh Act or the Act) protected the citizens of California against all arbitrary discrimination in the marketplace. In full retreat from the goal of equal access and opportunity, the majority today limit the Act so as to insulate invidious discrimination on the basis of economic class from legal redress. When we permit a landlord to refuse to rent an apartment because a tenant, who can afford to pay the rent, fails to meet an arbitrary income test, we promote rigid and invidious class distinctions which not only injure individuals who seek to better their positions, but which also undermine the vitality of the American dream of social mobility. I protest an interpretation of the Act that overturns established case law, ignores the intent of the Legislature, and damages our social fabric.

In this case, plaintiffs allege that, though they can afford to pay the rent which the landlord is asking for a rental unit, they were excluded from applying for the unit because of the landlord's policy of excluding any applicant whose monthly income is not greater than three times the monthly rent. The Court of Appeal found, consistent with our opinion in *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992], that plaintiffs had stated a cause of action under the Unruh Act. I would affirm the decision of the Court of Appeal.

I.

In *In re Cox, supra*, 3 Cal.3d 205, a young man saw a friend of his at a shopping center. The young man's friend wore long hair and dressed in an

unconventional manner. A security officer representing the shopping center soon ordered the young man and his friend to leave the shopping center, apparently because the guard wished to exclude the friend with long hair and unconventional dress. This court held that long hair and unconventional dress were unacceptable bases for exclusion.

This court recognized that the Unruh Act enumerated only certain categories of persons that expressly enjoyed protection of the Act. In light of the judicial and legislative history underlying the enactment of the Unruh Act in 1959, however, we concluded that the "identification of particular bases of discrimination—color, race, religion, ancestry, and national origin—added by the 1959 amendment, *is illustrative rather than restrictive*. [Citation.] Although the legislation has been invoked primarily by persons alleging discrimination on racial grounds, its language and its history compel the conclusion that the Legislature intended to prohibit *all arbitrary discrimination by business establishments*." (*In re Cox, supra*, 3 Cal.3d 205, 216, italics added.)

Our conclusion was based not on the premise that there is something particularly pernicious about discrimination based on one's clothing or personal appearance as opposed to other possible bases for exclusion, but rather on our conclusion that the Act bars all forms of arbitrary discrimination. Indeed, it is difficult to imagine *In re Cox, supra*, 3 Cal.3d 205, standing for any proposition other than that all forms of arbitrary discrimination are prohibited. Yet the majority suggest that *Cox* and its progeny " ' "must be construed with reference to the facts presented by the case[s]." ' " (Maj. opn., *ante*, at p. 1157.) In rejecting the clear language of *Cox*, however, it is unclear what the majority would agree that *Cox* held: Is arbitrary discrimination against "personal characteristics," against long hair and unconventional dress, or against friends of those with long hair and unconventional dress, proscribed under the majority's present interpretation of *Cox* "holding"? If our holdings were indeed only "construed with reference to the facts presented by the case," the majority opinion today could only be cited as holding that minimum income policies, rather than "economic discrimination" generally, lie outside the purview of the Unruh Act. It is clear that such a reading would not comport with the intent of the majority nor, I would concede, the holding of their opinion.

In any event, until today courts of this state have understood *In re Cox, supra*, 3 Cal.3d 205, to hold that *all* arbitrary discrimination by a business establishment is prohibited by the Unruh Act. (See, e.g., *Koire* v. *Metro Car Wash* (1985) 40 Cal.3d 24, 28 [219 Cal.Rptr. 133, 707 P.2d 195]; *O'Connor* v. *Village Green Owners' Association* (1983) 33 Cal.3d 790, 794 [191 Cal.Rptr. 320, 662 P.2d 427]; *Marina Point, Ltd.* v. *Wolfson* (1982) 30

Cal.3d 721, 732 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161];
*Rolon* v. *Kulwitzky* (1984) 153 Cal.App.3d 289, 291 [200 Cal.Rptr. 217];
*Curran* v. *Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d
712, 733 [195 Cal.Rptr. 325, 38 A.L.R.4th 607]; *Winchell* v. *English* (1976)
62 Cal.App.3d 125, 130 [133 Cal.Rptr. 20].) The Attorney General, inter-
preting the Unruh Act in 1976, advised that discrimination based on one's
receipt of public assistance was arbitrary and therefore, under this court's
holding in *Cox*, forbidden. (59 Ops.Cal.Atty.Gen. 223, 225 (1976).) Com-
mentators, too, agree that *Cox* prohibits all arbitrary discrimination. (See,
e.g., 5 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 11.41, pp. 65-72; 8
Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 748, pp.
241-242; Cal. Residential Landlord Tenant Practice (Cont.Ed.Bar 1986)
§ 2.11, p. 86.) In short, whatever ambiguity the majority read into the
holding of *Cox*, that ambiguity has not been perceived by this court, lower
courts, or the public.

"The doctrine of stare decisis necessarily implies that the fact a current
majority disagrees with a prior decision is not in itself sufficient to justify
overruling it. Otherwise all prior decisions would be exposed to continuous
challenge, the concept of precedent would be meaningless, and the decisions
of this court will sway with the political winds." (*People* v. *Anderson* (1987)
43 Cal.3d 1104, 1164 [240 Cal.Rptr. 585, 742 P.2d 1306] (dis. opn. of
Broussard, J.).) In spite of the fact that the majority do not expressly
overrule our holding in *In re Cox, supra*, 3 Cal.3d 205, they still run afoul of
the doctrine of stare decisis by limiting *Cox* to its facts.

In addition to their disregard for stare decisis, the majority refuse to
acknowledge the intent of the Legislature and its explicit adoption of *Cox*
and its progeny. In *Marina Point, Ltd.* v. *Wolfson, supra*, 30 Cal.3d 721, we
ruled that an apartment complex owner was prohibited from discriminating
against children or families with children by the Unruh Act. In coming to
this conclusion, we referred to legislative material which clearly reflected
the Legislature's understanding that all arbitrary discrimination was prohi-
bited by the Unruh Act.[1] When the Legislature added Civil Code section

---

[1] Our discussion in *Marina Point* was sufficiently conclusive that it bears repeating: "In
1974, the Legislature amended [Civil Code] section 51, reenacting the prior provisions of the
statute and adding 'sex' to the specifically enumerated bases of discrimination listed in the
Unruh Act. In sending the bill to the Governor for his signature, the Chairman of the Select
Committee on Housing and Urban Affairs explained: 'The purpose of the bill is to bring it to
the attention of the legal profession that the Unruh Act provides a remedy for arbitrary dis-
crimination for arbitrary discrimination against women (or men) in public accommodations
which are business enterprises. This bill does not bring such discrimination under the Unruh
Act because that Act has been interpreted as making *all* arbitrary discrimination illegal, on
whatever basis. The listing of possible bases of discrimination has no legal effect, but is mere-
ly illustrative.' (Original italics.) The chairman attached to his letter a legislative counsel

51.2 to the act, it *explicitly* adopted our holdings in *Marina Point* (discrimination against families with children arbitrary discrimination on the basis of age) and *O'Connor* v. *Village Green Owners' Association, supra*, 33 Cal.3d 790 (same): "This section is intended to clarify the holdings in Marina Point, Ltd. v. Wolfson (1982), 30 Cal.3d [721], and O'Connor v. Village Green Owners Association (1983), 33 Cal.3d 790." (Civ. Code, § 51.2, subd. (b).) The only exception the Legislature made in adopting the holdings of *Marina Point* and *O'Connor* was to allow for senior citizen housing in Civil Code section 51.3.

The majority's suggestion that the Legislature did not agree with, or was unaware of, the judicial interpretations of the Unruh Act is staggering. (See maj. opn., *ante*, at p. 1155 et seq..) Not only has the Legislature "not taken specific action to overrule [*In re Cox* and its progeny]" (*id.* at p. 1156), it has reenacted the Unruh Act and specifically adopted our interpretations of the Unruh Act. As we have noted in this context, "[i]t is a well-established principle of statutory construction that when the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction." (*Marina Point, Ltd.* v. *Wolfson, supra*, 30 Cal.3d 721, 734; see also *Estate of McDill* (1975) 14 Cal.3d 831, 837-838 [122 Cal.Rptr. 754, 537 P.2d 874].) The "legislative silence" to which the majority allude (maj. opn., *ante*, at p. 1156) is patently inapplicable here: the Legislature has twice amended and reenacted the exact provision at issue in this case.[2]

Notably, in adopting the holdings of *Marina Point, supra*, and *O'Connor, supra*, the Legislature did not amend Civil Code section 51 to prohibit discrimination against age. Yet the explicit language of Civil Code section 51.2 makes it clear that the Legislature expected that Civil Code section 51 would be construed to prohibit discrimination based on age—*even though it is not an enumerated category*. To consider "the repeated emphasis in the language of [Civil Code] sections 51 and 52 on the specified classifications of race, sex, religion, etc." as "highly persuasive, if not dispositive" in our construction of the Unruh Act (maj. opn., *ante*, at p. 1159) would be entirely antithetical to legislative intent.

Our decision in *In re Cox, supra*, 3 Cal.3d 205, held that all arbitrary discrimination by a business establishment is proscribed by the Unruh Act.

opinion, discussing our decision in *Cox* and confirming the chairman's view of the legislation." (*Id.* at p. 734.)

[2] Whatever the Legislature's "primary concern," I do not accept the majority's suggestion that the Legislature does not extensively "study and refine the language used in judicial decisions." (Maj. opn. at p. 1157.) Even if this were the case generally, it is beyond question that the Legislature was aware of our interpretation of the Unruh Act.

Subsequent judicial interpretations and legislative enactments have affirmed that holding. Thus the principles of stare decisis and deference to legislative intent compel me to conclude that the Court of Appeal was correct in recognizing plaintiffs' cause of action under the Unruh Act.

## II.

In order to find that "economic discrimination" is not covered by the Unruh Act, the majority reject *In re Cox*'s holding that the Act prohibits all arbitrary discrimination against business enterprises. In the absence of judicial precedent supporting the majority's desired result, the majority seize upon a legislative intent, undiscovered until today, from the principle of *ejusdem generis*: " ' " "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class." " ' " (Maj. opn., *ante*, at p. 1160.) The majority then engage in a dubious application of this principle to ascertain a "common element" of the enumerated categories of the Unruh Act: "The categories involve personal as opposed to economic characteristics—a person's geographical origin, physical attributes, and personal beliefs." (Maj. opn., *ante*, at p. 1160.)[3]

The reference to "personal characteristics" is of little value to courts and practitioners attempting to apply the Unruh Act in the future. There is no description of what, exactly, constitutes a personal characteristic. The majority opinion has listed three examples: geographical origin, physical attributes, and personal beliefs. Are personal characteristics therefore *only* origin, attributes, or beliefs, or is this list illustrative rather than restrictive?[4] Indeed, the term "personal characteristic" does not admit of clear definition, save for the majority's pointed emphasis that it does not include "economic characteristics."

---

[3] In light of our holding that the list of classes enumerated in the Unruh Act is illustrative, the majority uses a familiar rule of construction inappropriately, in a way that was condemned by the United States Supreme Court years ago: "The rule of *ejusdem generis* is a familiar and useful one in interpreting words by the association in which they are found, but it gives no warrant for narrowing alternative [or, in this case, additional] provisions which the legislature has adopted with the purpose of affording added safeguards. 'The rule of *"ejusdem generis"* is applied as an aid in ascertaining the intention of the legislature, not to subvert it when ascertained.'" (*United States* v. *Gilliland* et al. (1940) 312 U.S. 86, 93 [85 L.Ed. 598, 604, 61 S.Ct. 518].)

[4] Because the phrase "personal characteristic" is so amorphous, it is not even clear how the cases from which the majority derive the phrase fit this characterization. In *In re Cox, supra*, 3 Cal.3d 205, it was not the young man with long hair and unconventional dress whose action was validated by this court, but that young man's friend. Was the friendship a "personal characteristic"? Similarly, in *Rolon* v. *Kulwitzky, supra*, 153 Cal.App.3d 289, 292, was the plaintiff's homosexuality a personal characteristic, though not a physical attribute or a personal belief? I do not find the unifying theme underlying these cases apparent.

Starting with our observation in *Koire* v. *Metro Car Wash, supra,* 40 Cal.3d 24, 36, that several forms of economic discrimination are unassailable under the Unruh Act, including stated price and payment terms, the majority proceed to assert that this dictum cannot be distinguished from the instant case. The majority make a facile comparison between the "discrimination" discussed in *Koire* and minimum income policies: "The minimum income policy is no different in its purpose or effect from stated price or payment terms. Like those terms, it seeks to obtain for a business establishment the benefit of its bargain with the consumer: full payment of the price." (Maj. opn., *ante,* at p. 1163.) While landlords' *pricing decisions* are inviolable under the Unruh Act, *credit policies* in housing, including exclusionary policies among those who can afford to pay the stated price, are not. The comparison fails to account for the fact that a minimum income policy may be used in a way that stated price and payment terms may not be used—to discriminate against poor people.

The effect of the majority's holding today is that the poor no longer have standing to challenge arbitrary and invidious discrimination against them as a class under the Unruh Act. We know that the poor are discriminated against. Sociologists have observed that the "majority" of Americans explain poverty as being the result of an individual's personal characteristics. One nationwide public opinion survey showed that the reasons for poverty most cited by the majority of the survey's respondents were "[p]oor management of personal resources, loose morals, lack of thrift, and so forth . . . ." (See Hendrickson & Axelson, *Middle-Class Attitudes Toward the Poor: Are They Changing?* (June 1985) Social Service Rev. 295, 296.)[5] Such misguided attitudes about the poor, if used without giving due consideration to a particular individual's characteristics, would clearly constitute arbitrary discrimination against a poor customer. A retail merchant should not be permitted to refuse to sell to a person willing and able to pay the stated price merely because the merchant refuses to deal with "poor" people.

Unfortunately, discrimination against poor people is not confined to attitudes. Prior to 1977, widespread use of "redlining," systematically refusing loans to people living in relatively poor urban areas, led the United States Congress to enact the Community Reinvestment Act, 12 United States Code section 2901 et seq., to curb this practice. Though not specifically referring to the "poor," it is clear that in prohibiting discrimination based on a credit applicant's receipt of public assistance, the United States Congress wished to protect the nation's poor from discrimination through the Equal Credit Opportunity Act. (15 U.S.C. § 1691(a).) Similarly, the

---

[5] See Feagin, Subordinating the Poor: Welfare and American Beliefs (1975) for an extended discussion of the stigma that has generally attached to the poor.

California Attorney General opined that persons receiving public assistance benefits were protected by the Unruh Act, primarily because receipt of public assistance benefits "do[es] not necessarily correlate with qualities undesirable in tenants or disruptive of a living environment." (59 Ops.Cal.Atty.Gen., *supra*, at p. 225.)

It is obvious that a minimum income policy might be invoked legitimately by a business to ensure payments for goods sold on credit; it should be equally obvious that minimum income policies might be abused, motivated solely by a discriminatory animus. A jewelry store could forbid the entrance of lower income patrons on the theory that lower income patrons buy jewelry less frequently and steal jewelry more frequently. An auto insurance company could refuse to do business with persons of low income by asserting that low income drivers are worse drivers as a class and thus tend to be more accident prone. While these businesses would undoubtedly be able to suggest economic reasons for their policies, we have not accepted such pretexts in other Unruh Act cases. (See, e.g., *Koire* v. *Metro Car Wash, supra*, 40 Cal.3d 24, 32; *Marina Point, Ltd.* v. *Wolfson, supra*, 30 Cal.3d 721, 740, fn. 9.) I am unable to understand a policy that would protect from arbitrary discrimination based on a person's sex or age, but not based on that person's poverty.

Finally, I do not understand why poverty is any less a "personal characteristic" than long hair or unconventional dress. Neither is immutable; both personal appearance and poverty are likely to inspire in us certain stereotypical views that will likely color our perceptions. Indeed, the person with long hair or unconventional dress is far more able to escape from discrimination based on these characteristics than the person suffering the ills of poverty; by contrast, to escape from poverty the poor often must first escape unsanitary conditions, unsafe neighborhoods, and ineffective schools. The chilling irony of the majority's decision today is that, because they are being discriminated against for "economic" rather than "personal" characteristics, the poor may no longer challenge a landlord's arbitrary income policy, even when it is that policy—rather than the cost of the housing—that prevents them from moving into better housing in better neighborhoods with better school facilities. The majority's implicit assumption that such discrimination does not occur is unfounded, and its holding insulating such discrimination from review under the Unruh Act is unconscionable.

III.

Stare decisis and legislative adoption declare that the Unruh Act was intended to proscribe all arbitrary discrimination. Using a single rule of construction, the majority greatly limit the scope of the Unruh Act with a

term, "personal characteristics," that is sure to invite litigants to press the courts to limit the Unruh Act even more than this court does today. In the meantime, the majority have emphatically declared that from today, the Unruh Act may not be used by the poor to remedy arbitrary discrimination by business establishments against those in poverty. For reasons discussed above, I cannot join in the majority's abandonment of established principles and their significant weakening of the important protections of the Unruh Act.