17 Cal.Rptr.3d 674 (2004)
121 Cal.App.4th 823
Helga CARTER, Plaintiff and Respondent,
v.
CALIFORNIA DEPARTMENT OF VETERANS AFFAIRS, Defendant and Appellant.
No. E030908.
Court of Appeal, Fourth District, Division Two.
August 17, 2004.
Review Granted December 1, 2004.
*676 Joseph Maguire, John H. McCardle, Hayward, and Patricia M. Keegan for Defendant and Appellant.
Terry K. Davis, Napa, for Plaintiff and Respondent.
Graves & King, Patrick L. Graves, Harvey W. Wimer III, Riverside, and Dennis J. Mahoney, San Bernardino, for Diversified Paratransit, Inc. and California Manufacturers & Tech. Ass'n.; Jones Day for the Los Angeles Unified School District; Law Office of David J. Duchrow and David J. Duchrow, for California Employment Lawyers Association, as Amicus Curiae on behalf of Plaintiff and Respondent.

*675 OPINION
WARD, J.
Plaintiff and respondent Helga Carter worked as a nurse in a veterans residence facility administered by defendant and appellant, the Department of Veterans Affairs (the employer). Plaintiff sued the employer, alleging it was liable for sexual harassment on a hostile environment theory. The alleged hostile environment was created, not by a coemployee, but by one of the patient residents of the facility. The trial court held that an employer may be liable under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) for the harassing *677 conduct of clients or customers, and gave judgment for plaintiff.
The employer appealed. The first time the matter was before us, we reversed the judgment, concluding, based upon our construction of the relevant provisions, that the FEHA did not impose liability upon an employer for sexual harassment perpetrated by a client or customer of the employer. The California Supreme Court granted review of that decision. Afterward, the Legislature amended Government Code section 12940, subdivision (j)(1), expressly providing that an employer may be responsible for sexual harassment by nonemployees. The amendment was purportedly intended to clarify the ambiguities in the statute, and expressly to alter the result in this case. The Supreme Court has remanded the matter for reconsideration under the amendments to the FEHA; we now address the appeal in that light.

FACTS AND PROCEDURAL HISTORY
The employer, an agency of the State of California, owns and operates certain "Veterans' Homes," to care for "aged and disabled" veterans. The Veterans' Homes provide varying levels of care, from independent living to skilled nursing care. Plaintiff, a registered nurse, was hired in 1996 and assigned to work in the ambulatory care clinic, which provides outpatient services to the veterans occupying independent living facilities.
Elbert Scott Brown, a veteran, was a tenant resident of the independent living facilities of the Veterans' Home where plaintiff worked. Brown received a penile implant in 1996. Plaintiff performed some nursing care for Brown relative to his penile implant. After receiving the implant, Brown began making suggestive remarks to plaintiff, such as, "You've got nice breasts," or "You've got a nice ass."
Quilting was one of Brown's hobbies. At a social event in approximately October of 1996, Brown offered to give quilting lessons to some of the staff members. For about two months thereafter, plaintiff made frequent visits to Brown's room, ostensibly for quilting lessons. Plaintiff testified that she would receive instruction from Brown; then, at home, she would work on the quilt on her sewing machine. The next day, she would show Brown her progress and receive instruction on the next step. It took plaintiff about two months to complete a quilt for her daughter.
After plaintiff finished her quilting project with Brown, she stopped spending so much time with him. Plaintiff started learning how to play pool with another resident, Ray Bishop. Bishop resided in the same building as Brown. Plaintiff would occasionally have coffee with Bishop.
Residents of the Veterans' Home were generally veterans over the age of 62, or suffering from some disability which prevented them from earning a living. To provide a social outlet for the residents, the Veterans' Home had an "adopt-a-resident" program at the holidays under which staff or employees might invite a resident to share Thanksgiving or Christmas dinner in the employee's home. As part of the "adopt-a-resident" program, plaintiff invited Brown to her home for Thanksgiving dinner. Brown seemed particularly lonely. Brown was alienated from his family; his family members did not visit him at the Veterans' Home. For some time, Brown had been advertising for a companion in "senior singles" magazines.
In addition, after plaintiff had completed the quilt, she on one occasion invited Brown to dinner to thank him for his help.
At first, plaintiff regarded Brown's remarks and attitude toward her as inappropriate *678 but harmless. Plaintiff hoped, for example, after Brown had visited her home, that he would realize that plaintiff had a husband and family, and that he would stop his inappropriate conduct.
Instead, sometime after the holidays, Brown's behavior became worse. According to plaintiff, Brown became "very attached" to her. Plaintiff explained that Brown told her that he was "having no luck" with his personal advertisements, but "he didn't really need to, he felt at that point because, after all, he had me." Brown told plaintiff that he wanted to sleep with her. Plaintiff tried to laugh it off; she told Brown she was happily married. Brown threatened that, if plaintiff refused, he would ruin her reputation by telling everyone that he had slept with her. Plaintiff was "shocked at his persistence"; Brown said she "might as well sleep with him either way," because he would ruin her reputation whether she did so or not. Plaintiff still refused; she told Brown to "[p]ut a sign on the freeway. . . . I don't care. It will never happen." Plaintiff later overheard Brown telling others in the clinic that plaintiff was sleeping with him.
At some point, plaintiff complained to her supervisor about Brown. Brown did not desist, however. Plaintiff testified that Brown "continued harassing me in the clinic. He was chasing me in the hall with his scooter. He was there first thing in the morning when I unlocked the clinic. He came to the clinic many times a day for no reason. He was everywhere." Plaintiff testified that Brown several times tried to ram her with his scooter. He would call and leave derogatory and sexually explicit messages on her home telephone recorder.
After plaintiff complained, the employer undertook to counsel Brown to leave plaintiff alone. Plaintiff was issued a walkie-talkie she could use to call security if Brown caused problems at the clinic. Plaintiff testified, however, that Brown's conduct did not change.
Plaintiff twice went on stress leave. After the expiration of her second leave, plaintiff did not return to work. Brown was still residing in the Veterans' Home, and, according to plaintiff, "nothing had changed." Consequently, she was afraid to return to work.
Plaintiff believed that something could have been done under the Veterans' Home code of conduct to move Brown to another facility, though she was not herself familiar with the procedures necessary to remove a resident from the home. While plaintiff was on disability leave, she filed an initial complaint with the Department of Fair Employment and Housing (DFEH), and was issued a right-to-sue letter. She did not pursue that complaint, however, because plaintiff's supervisor had told her that, as a state employee, plaintiff could not sue the employer, a state agency. Plaintiff's superiors also told her that if she pursued legal action, she would be fired. Plaintiff later discovered that she was not legally prohibited from pursuing a sexual harassment complaint against the state. She filed an amended complaint with the DFEH. After receiving a right-to-sue letter, she initiated the instant action.
At trial, the employer's defense strategy was largely to suggest that plaintiff may in fact have had some kind of relationship with Brown, and that Brown became jealous when plaintiff began spending time with Bishop.
In discovery responses, however, the employer admitted that plaintiff had complained of sexual harassment, and that she had called security several times to the clinic regarding disturbances caused by Brown.
The administrator of the Veterans' Home, Thomas Langley, also acknowledged *679 that residents were subject to a code of conduct which prohibited all sorts of disruptive behavior, including sexual harassment. Among other sanctions, a resident may be evicted for misconduct.
Langley was newly assigned to the Veterans' Home during the time that plaintiff experienced difficulties with Brown. Langley testified that, shortly after he began his assignment, plaintiff had complained to him about Brown. Langley advised plaintiff to have no contact with Brown and that, if Brown came to the clinic, plaintiff should leave the area. Brown would be seen by another nurse. Langley called Brown in "to find out his side of the story." Brown maintained that "this was not his fault," and that he believed there was common affection between plaintiff and himself. Langley directed Brown to "cease and [de]sist" from any further contact with plaintiff; "regardless of the circumstances, he was not to speak to or about [plaintiff]." Langley also told Brown that "he was never to go to the clinic without being accompanied except for emergency care," on pain of possible dismissal from the Veterans' Home.
In addition, Langley referred the matter to the staff social worker for treatment of Brown's behavior. The social worker, William Rigole, attempted intervention through individual counseling. Brown told Rigole that he and plaintiff had had an intimate relationship, and that he felt "jilted" when plaintiff stopped talking to him.
Evidence at trial showed that the employer's sole basis for believing that plaintiff had had a sexual relationship with Brown was Brown's statements. In fact, although the only sexual encounter Brown had claimed to have had with plaintiff was one tryst at a motel, the motel had no record of Brown's or plaintiff's occupancy at the motel.
Rigole determined that Brown's conduct toward plaintiff was inappropriate and instituted a "therapeutic contract" with him. Brown continued to be upset and jealous, however; he was preoccupied with plaintiff's supposed relationship with Bishop, and remained "somewhat sexually fixated."
The staff member responsible for the residential building where Brown lived also described Brown's personality characteristics. The residents of the independent living facilities normally were assigned two to a room. Brown, however, never had a roommate for very long. He would complain that his roommate snored, or he would leave the light on, disturbing the roommate's sleep. The roommates always wanted to be moved from Brown's room. On the surface, Brown was friendly enough, but "he didn't mingle amongst the other individuals only because he felt like he was more of an upper class level, and he was residing with lower class residents there." Brown was "a proud, boastful man." The staff member also testified that Brown was angry and jealous over the perceived attention plaintiff was giving to Bishop, rather than spending time with Brown.
Plaintiff's complaint alleged causes of action for sexual harassment, failure to maintain a workplace free from sexual harassment, retaliation, and intentional infliction of emotional distress. The trial court granted the employer's motion for summary adjudication as to the retaliation and intentional infliction of emotional distress claims; the court also dismissed plaintiff's claim for punitive damages.
At trial upon the remaining causes of action, the employer moved for a directed verdict on the basis that the FEHA does not impose liability on employers for third party (i.e., nonemployee) harassment, and that the employer had discretionary immunity *680 under Government Code section 820.2. The court denied the motion for directed verdict.
On a special verdict, the jury found that plaintiff was subjected to hostile environment harassment, the employer knew or should have known of the harassment, and the employer failed to take immediate and appropriate steps to correct the situation. Accordingly, the jury awarded plaintiff $34,788 in economic damages and $150,000 in noneconomic damages. The court entered judgment on the verdict.
The court denied the employer's motion for judgment notwithstanding the verdict (JNOV). The court granted plaintiff's motion for attorney fees. The employer appealed.
The primary focus of the first appeal was whether an employer may be held liable under the FEHA for the conduct of a client or customer. The employer argued that the statute imposed no such liability. The employer further contended that it was immune from liability, as a governmental agency, for its discretionary decisions. It exercised its discretion in attempting to address the problem of the alleged harassment by Brown, a client of the Veterans' Home. The employer argued, in addition, that the evidence was insufficient to support the judgment, because there was inadequate proof Brown harassed plaintiff on account of her sex, rather than because of a personal animus arising from a "failed relationship."
The employer repeated essentially the same points in its arguments that the trial court had erred in instructing the jury and in preparing the special verdict form. Thus, the employer argued, the court had erred in instructing the jury that the employer could be liable for nonemployee harassment, in allowing the jury to review the employer's exercise of discretion, for which it was immune, and in refusing the employer's instruction on a "failed relationship" defense. The employer also argued the court should have given instructions apportioning fault between itself and Brown. The employer urged that the special verdict form was inadequate in the same respects as the instructions. Finally, the employer contended that the trial court had abused its discretion in awarding attorney fees to plaintiff.
We had concluded on our initial review that the FEHA did not impose employer liability for nonemployee harassment. We found the issue dispositive, and reversed the judgment on that ground. We therefore did not address the remaining issues: immunity, sufficiency of the evidence, defenses, apportionment, or attorney fees.
The California Supreme Court granted review of our initial decision.[1] In the meantime, the Legislature amended the relevant provisions of the FEHA, however, to provide for employer liability for sexual harassment by nonemployees. The California Supreme Court then dismissed its review, and remanded the matter to us for reconsideration.[2] The Salazar court has published its revised opinion in Salazar v. Diversified Paratransit, Inc. (2004) 117 Cal.App.4th 318, 11 Cal.Rptr.3d 630 (Salazar II), holding the employer's conduct in that case was subject to the statute as *681 amended. In light of Salazar II and the statutory amendment, we now reexamine the issues raised on appeal.

ANALYSIS

I. The FEHA Does Not Generally Impose Employer Liability for Client or Customer Misconduct

A. Standard of Review
The coverage issue  whether an employer liable for prohibited harassment committed by nonemployees, such as clients or customers  is one of statutory construction. Statutory construction presents a question of law which we review de novo.[3]

B. Rules of Statutory Construction
The court's "role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we look first to the words of the statute, giving the language its usual, ordinary meaning. If there is no ambiguity in the language, we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.]"[4] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose."[5] "[A] construction making some words surplusage is to be avoided."[6]
Application of these rules is sometimes difficult, however. For example, other rules of construction teach that the "`language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.'"[7] Thus, "`[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.'"[8]
Our foremost task remains ascertainment of the legislative intent, including consideration of "the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness."[9] We must always give due regard to "the object to be achieved and the evil to be prevented by the legislation."[10]

C. The Competing Theories on the First Appeal
Plaintiff and the employer each urged that the purpose of the FEHA was "clear," but each initially based this reliance upon different sources within the FEHA.
Before the 2003 amendment, plaintiff based her contention upon the expression of intent in the preamble of the FEHA. The uncodified preamble states: "The Legislature finds and declares that it is the existing policy of the State of California to *682 prohibit harassment and discrimination in employment on the basis of any protected classification. Such conduct whether intentional or unintentional is a violation of the civil rights of California citizenry and has been shown to decrease productivity in the workforce. It is the existing policy of the State of California, as declared by the Legislature, that procedures be established by which allegations of prohibited harassment and discrimination may be filed, timely and efficiently investigated, and fairly adjudicated, and that agencies and employers be required to establish affirmative programs which include prompt and remedial internal procedures and monitoring so that their worksites will be maintained free from prohibited harassment by their agents, administrators, and supervisors as well as by their nonsupervisors and clientele. To further this intent, the Legislature enacts this act."[11]
Plaintiff argued that the words of legislative purpose were clear on the face of the enactment, in the form of the uncodified preamble. Plaintiff correctly asserted that an uncodified preamble is fully part of the statutory law of this state; it is simply uncodified.[12] Under the preamble's statement of purpose, therefore, when Government Code section 12940 (hereafter, section 12940) subdivision (j)(1) (before the 2003 amendment; hereafter referred to as former section 12940(j)(1)) provided, in part, that it is an unlawful employment practice "[f]or an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person [italics added], because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, to harass an employee," it should mean literally what it says: that harassment of an "employee," on the basis of any proscribed animus, by an employer, "or any other person,"  presumably including a client or customer  is unlawful under the statute.
The employer emphasized other, codified, portions of the FEHA, however, which suggested that employers are not liable for harassment perpetrated by "clientele" or customers, or other nonemployees. That is, the employer placed reliance on the second sentence of former section 12940(j)(1), which specifically stated: "Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Italics added.) Thus, under the employer's reading of former section 12940(j)(1), an employer/entity may be held liable for unlawful harassment of an employee, if and only if the harassment is committed by an employee, other than an agent or supervisor, and only if the employer/entity knew about the harassment but failed to take corrective action. The second sentence does not appear to impose liability for harassment, in any of its prohibited forms, on an employer/entity for failing to take corrective action, as to any harasser except another (nonsupervisory) employee.
Our opinion on the first appeal dealt solely with which of these two proffered interpretations of former section 12490(j)(1) better comported with the language and purposes of the FEHA.

*683 D. Section 12940 Does Not Make Employers Liable Generally for Harassment Committed by Nonemployees

Former section 12940(j)(1) stated:
"It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, . . . [¶] . . . [¶]
"(j)(1) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, sex, age, or sexual orientation, to harass an employee, an applicant, or a person providing services pursuant to a contract. Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment."
Subdivision (k) of section 12940 (hereafter, section 12940(k)) states that it shall be an unlawful employment practice "[f]or an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."
Plaintiff argued that the first and third sentences of section 12940(j)(1) are not qualified by limitation to specific persons. Under this view, it would be an unlawful employment practice for anyone, i.e., an "employer," or "any other person," to harass an employee on the basis any of the prohibited classifications. The words "any other person" must be taken to include nonemployees, such as customers and clientele. The duty of an "entity" to take "all reasonable steps to prevent harassment," in former section 12940(j)(1) and section 12940(k), would likewise not be limited, at least on the face of these provisions, to the prevention of harassment by any particular person. Thus, plaintiff argued, when the first and third sentences of former section 12940(j)(1) are read together, they impose liability on an employer for failing to prevent harassment by customers and clientele.
Upon deeper analysis, however, we concluded that plaintiff's construction failed to account for the complete context: i.e., all the sentences in former section 12940(j)(1).
The first sentence of former section 12940(j)(1) stated that liability for harassment might be imposed upon an employer, upon any similar entity, "or [upon] any other person," for unlawful acts of harassment committed by such entity or person directly upon an employee. To the extent the first sentence of former section 12940(j)(1) may be read to make it unlawful for a client or customer  as "any other person"  to harass an employee, it is the client or customer alone who bears the responsibility for such acts. Thus, even if the first sentence of section 12940(j)(1) were to be read to "cover" acts of harassment by "any other person," as plaintiff had argued, it simply did not address employer liability for the acts of another.
Otherwise, the first sentence of former section 12940(j)(1) would have to be read to impose liability on the employer not only for harassment committed by "any other person," but also for harassment committed by any of the other listed entities, such as a labor organization, an employment agency, an apprenticeship training program, and any training program *684 leading to employment. Parallel construction of the references leads inevitably to this conclusion. The conclusion is, however, obviously absurd, and therefore untenable.
Former section 12940(j)(1) was patently intended to impose separate liability on each of the named entities for its own wrongs, not for the wrongs of any or all of the others. Just as an employer should be liable for harassing an employee, applicant, or contracted service provider, so a labor organization should be separately liable for harassing an employee, applicant, or contracted service provider; an employment agency should be separately liable for harassing an employee, applicant or contracted service provider; an apprenticeship program should be liable for harassing an employee, applicant or contracted service provider; etc. Likewise, the reference in the first sentence of former section 12940(j)(1) must mean that "any other person" who commits acts of harassment is separately liable for his or her own unlawful acts committed upon an employee, applicant, or contracted service provider. The first sentence of former section 12940(j)(1) cannot reasonably be read to impose broad employer liability for the acts of all the other mentioned entities, leaving all such others to escape their own liability for harassment; thus, it simply does not address employer liability, other than for its own acts.
The second sentence of former section 12940(j)(1), by contrast, does explicitly address the liability of an employer or one of the other named entities for the acts of others. That is, an employer, labor organization, employment agency, apprenticeship program, and so on, may be liable for unlawful harassment perpetrated by another, but only on account of "an employee"  presumably of an employer, or of a labor organization, or of an apprenticeship program, etc.  "other than an agent or supervisor,"[13] and, even then, only if two other requirements are met: The employer/entity, or its agents or supervisors, must be on notice of the harassing conduct, and the employer/entity must have failed to respond with corrective action.[14]
In this context, we determined that the third sentence of former section 12940(j)(1) could properly refer only to the second sentence. An employer or other covered entity would be required under the third sentence of former section 12940(j)(1) to "take all reasonable steps to prevent harassment from occurring," but this duty would apply only when the employer/entity could otherwise be liable for harassment. An employer/entity would be liable for harassment committed "by another," only under the second sentence of former section 12940(j)(1), when the harassment was committed by an employee other than an agent or supervisor, and only with notice and failure to act.
The third sentence of former section 12940(j)(1), could not have been read as plaintiff argued  i.e., to single out employers as being required to "take steps" to prevent harassment by anyone, including labor organizations, employment agencies, *685 apprenticeship programs, and individuals, including customers and clientele  because the second sentence of former section 12940(j)(1) would not then have limited liability so strictly for acts committed by others.
That is, we held, the second sentence of former section 12940(j)(1) set the conditions for employer/entity liability for acts of harassment committed by another. It imposed such liability only for a coemployee, and only if the employer/entity had both (1) had notice of the coemployee's acts of harassment, and (2) had failed to take corrective action.
The first sentence of former section 12940(j)(1) could not be read to imply broad liability for, and impose an equally far-reaching duty solely on employers to prevent harassment by, all manner of nonemployee third parties, including labor organizations, employment agencies, apprenticeship programs, as well as customers and clientele. If it had so provided, the second sentence of former section 12940(j)(1) would either have to be considered redundant, or it would have expressly included customers and clientele within its ambit. We must reject an interpretation which renders a provision mere surplusage,[15] and no express provision for liability for the acts of customers or clientele was included in the second sentence of former section 12940(j)(1). The duty to "take all reasonable steps to prevent harassment," then, logically could refer only to harassment committed by coemployees, other than supervisors or agents. It did not refer to harassment committed by a client or customer of an employer/entity.
Our reading of the legislative history of former section 12940(j)(1) also confirmed our interpretation. We examined language that had been rejected, changed, or retained in the enacted version of the statute to glean the meaning of former section 12940(j)(1).[16]
The legislative history of 1984 amendments to former section 12940 showed that the Legislature had rejected a proposed amendment which expressly would have made an employer or other entity liable for harassment by clients or customers. This legislative history still supports the conclusion that employers and other named entities are generally not liable for harassment committed by clients and customers.
As originally enacted, the provision which became (part of) former section 12940(j)(1) stated: "Harassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."[17] (Italics added.)
In 1984, an amendment was proposed, as follows: "Harassment of an employee or applicant by an employee any person other than an agent or supervisor shall be unlawful if the entity, or its agents or *686 supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."[18] Such an amendment to the portion of former section 12940(j)(1) imposing liability on an employer/entity for the acts of others would necessarily have included clients and customers, but only, as before, if that employer/entity had had notice of the harassment and had failed to act.
The bill proposing this amendment was itself amended, however, to delete the language which would have imposed liability on an employer for harassment by "any person." The change restored the language imposing liability only for nonsupervisory employees: "Harassment of an employee or applicant by any person an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."[19] The deletion of "by any person" and replacement with "by an employee," shows that the Legislature had the opportunity to adopt expanded employer liability, but elected not to do so. The Legislature's purposeful deletion of language which appeared in an earlier proposed version of a statute constitutes strong evidence that the final statute as enacted should not be construed to include the omitted provision.[20] It is beyond the proper role of a court to add language which the Legislature has expressly rejected. Accordingly, we concluded that former section 12940(j)(1) did not, at least up to the 2003 amendment, require employers or other entities to assume liability for any acts of harassment perpetrated by customers and clientele.
Plaintiff had relied in the earlier appeal on certain federal cases to show that employers could be held liable for third-party harassment under federal anti-discrimination law.[21] We noted, however, that the particular provisions of the federal law which impose employer liability for customer harassment had no counterpart in the California law (FEHA). The specific provisions of what eventually became former section 12940(j)(1) were patterned on equally specific provisions of Equal Employment Opportunity Commission (EEOC) regulations, contained in 29 Code of Federal Regulations (CFR) part 1604.11, (hereafter, 29 CFR 1604.11) as it existed in 1982, when the FEHA was initially adopted.[22] Regulation 29 CFR 1604.11(e) provided: "(e) An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control *687 and any other legal responsibility which the employer may have with respect to the conduct of such non-employees." Any provision like this was conspicuously absent from the formulation of the FEHA, as expressed in former section 12940(j)(1). We concluded that the omission of any provision in the FEHA which mirrored 29 CFR 1604.11(e), when all the surrounding provisions had been incorporated into the FEHA, represented a deliberate intent not to include liability for third-party harassment in section 12940. We noted that, "[w]hile as a general rule the courts have looked to federal decisions under Title VII for assistance in interpreting [the] FEHA `where appropriate' [citations], it is not appropriate to follow federal decisions where the distinct language of [the] FEHA evidences a legislative intent different from that of Congress. [Citation.]"[23] Consequently, we rejected plaintiff's reliance on her proffered federal cases.
Consistent with the above-outlined analysis of former section 12940(j)(1), we held that the FEHA did not impose a duty on the employer here to protect an employee such as plaintiff from harassment by a nonemployee.
On August 13, 2003, the California Supreme Court granted review of this case; on November 19, 2003, that court transferred the case to us once again, with directions to vacate our former decision and to reconsider the matter in light of the enactment of chapter 671 of the Statutes of 2003. We now turn to the specifics of that provision.

II. The FEHA Amendment Does Not Apply to This Case

A. The Amendment
By Statutes of 2003, chapter 671, section 1, page 4072, the Legislature amended former section 12940, subdivision (j)(1). As we have described, former section 12940, subdivision (j)(1) had provided in relevant part that it is an unlawful employment practice, "For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, to harass an employee. . . . Harassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." The amendment added a provision, between the second and third sentences of former section 12940(j)(1), to the effect that, "An employer may also be responsible for the acts of nonemployees, with respect to sexual harassment of employees, . . . in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing cases involving the acts of nonemployees, the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of those nonemployees shall be considered."[24]
The Legislature has further declared that, "[i]t is the intent of the Legislature in enacting this act to construe and clarify the meaning and effect of existing law and to reject the interpretation given to the law in Salazar v. Diversified Paratransit, Inc. (2002) 103 Cal.App.4th 131, 126 Cal. *688 Rptr.2d 475."[25]

B. Standard of Review and Principles of Construction
De novo review applies to issues of statutory interpretation, including the retroactivity of a statute. "`"[T]he construction of statutes and the ascertainment of legislative intent are purely questions of law. . . ." [Citation.]' [Citation.]"[26]
The normal rule is that a statutory enactment is applied prospectively only.[27] "[T]he presumption that legislation operates prospectively rather than retroactively is rooted in constitutional principles. . . ."[28] Thus, "statutes do not operate retrospectively unless the Legislature plainly intended them to do so. [Citations.]"[29] More specifically, the Legislature must expressly provide that it is to be retrospective; otherwise, "a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application."[30] Under this "`general prospectivity principle,' . . . a statute's retroactivity is, in the first instance, a policy determination for the Legislature and one to which courts defer absent `some constitutional objection' to retroactivity."[31]
A statute is said to operate retrospectively if it substantially changes the legal consequences of past events.[32] However, "[w]hen a statute `merely clarifies, rather than changes, existing law, . . .'"[33] it is deemed not to operate retrospectively, even if applied to cases pending at the time of its enactment. This is because, in theory, "`the true meaning of the statute remains the same.'"[34] A legislative declaration concerning "the prior import of its statutes [is] entitled to due consideration, and we cannot disregard [it]."[35] Nonetheless, "a legislative declaration of an existing statute's meaning is neither binding nor conclusive in construing the statute. Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to *689 the courts. [Citations.]"[36]

C. The Legislature Did Not Expressly Declare the Amendment Was to Be Retroactive
As noted, statutes operate prospectively only, unless the Legislature declares otherwise. As is plain on the face of the amending statute, the Legislature did not expressly declare that the amendment was to apply retrospectively.

D. The Amendment Effected a Change in the Law
The Legislature did expressly declare that it intended "`in enacting this act to construe and clarify the meaning and effect of existing law and to reject the interpretation given to the law in Salazar v. Diversified Paratransit, Inc. (2002) 103 Cal.App.4th 131, 126 Cal.Rptr.2d 475.'"[37]
Despite the Legislature's declaration of intent, however, we cannot conclude that the amendment was simply a clarification of existing law. To reiterate, the added sentences to section 12940 provide: "An employer may also be responsible for the acts of nonemployees, with respect to sexual harassment of employees, applicants, or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing cases involving the acts of nonemployees, the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of those nonemployees shall be considered."
The amendment differs from the other provisions of section 12940(j)(1) in two significant ways. First, unlike the provisions of former 12940(j)(1) which we have reviewed extensively, above, the amendment does not impose liability for harassment upon any "entity" other than an employer. In other words, unlike the other sentences in former section 12940(j)(1), the amendment does nothing to impose responsibility on, e.g., a labor organization, employment agency, or apprenticeship program, for harassment by a nonemployee. The amendment specifically singles out employers for this liability.
Second, former section 12940(j)(1) provided liability for harassment based upon any animus forbidden by the FEHA: i.e., race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age or sexual orientation. The amendment not only singles out employers for nonemployee liability, but also provides that such liability may be imposed solely for sexual harassment.
If plaintiff's proffered interpretation of former 12940(j)(1) had been correct, and that provision had always contemplated liability for harassment by nonemployees, then such liability would have been provided under existing law for labor organizations, employment agencies and apprenticeship programs, as well as for employers, and liability would be imposed for such nonemployee harassment on any of the bases prohibited by the FEHA. The "clarifying" enactment would not restrict liability to employers and would not impose liability solely for nonemployee sexual harassment. Patently, therefore, "the true meaning of the statute" has not "remain[ed] the same," and the amendment is not merely declaratory *690 of existing law, but has effected a substantial change in the law.
This conclusion is also supported by the legislative history of the amendment itself. In this respect, we agree with the dissent in Salazar II,[38] as decided upon remand: "The legislative history also shows that in Assem. Bill 76 the Legislature deliberately rejected a broad prohibition against harassment of whatever kind. Instead the Legislature enacted a version of Assem. Bill 76 which limited an employer's potential liability to sexual harassment of employees by nonemployees. [¶] As initially proposed, Assem. Bill 76 prohibited all harassment of employees by any person. Early versions of Assem. Bill 76 referred to employer responsibility for acts `with respect to harassment of employees' and to `[h]arassment of an employee . . . by any person.'[39] On June 19, 2003, the Senate deleted the prohibition against harassment `by any person' and added a sentence stating that `[a]n employer may be responsible for the acts of nonemployees, with respect to harassment of employees. . . .'[40] On August 28, 2002, the Senate limited the prohibitions against harassment to `sexual harassment.' [Fn. omitted.] . . . [¶] The June 19 and August 28, 2003 amendments thus materially changed the initial version of Assem. Bill 76 by narrowing employers' statutory liability from broad `harassment by any person' to `acts of nonemployees, with respect to sexual harassment of employees.' The existence of these starkly different substantive amendments precludes any conclusion that Assem. Bill 76 clarified and construed existing law."[41]
The amendment thus effected a significant change in the substantive law and did not merely clarify existing law.
We fully recognize that the Salazar II majority has decided that the amendment merely clarifies existing law. (117 Cal. App.4th 318, 328, 11 Cal.Rptr.3d 630.) The majority there did not fully analyze the language and context of the amendment, however. In our view, the pre-amendment version of section 12940, subdivision (j) is not merely ambiguous on the question of employer liability for client harassment of employees. The amendment evinces, in our view, an intent to change the law, inasmuch as the prior statutory language did not, upon thorough analysis, bear an interpretation that would impose such liability. The peculiar restrictions of the amendment, which limit liability to instances of sexual harassment committed by clients, renders the assertion that section 12940, subdivision (j) "always" imposed such a liability, patently untenable.

E. The Legislature Has Nevertheless "Very Clearly" Expressed an Intent to Apply the Amendment Retroactively
Had the amendment to section 12940(j)(1) simply "clarified" existing law, its application to this case would not be considered retrospective, because its substance would have "always been the law." We have determined that the amendment was not a mere clarification, but a substantive change in the law. Our inquiry is not *691 ended by this determination, however; the possibility still exists that the Legislature has intended the amendment to apply retroactively, notwithstanding the change in the law. Thus, "even if the court does not accept the Legislature's assurance that an unmistakable change in the law is merely a `clarification,' the declaration of intent may still effectively reflect the Legislature's purpose to achieve a retrospective change."[42]
The circumstances of the enactment here indicate a plain intent that, even if the amendment cannot be deemed declaratory of existing law, the Legislature nonetheless meant it to apply retroactively to this case; the amendment specifically states that its purpose is to alter the result in Salazar I, a parallel case. The statement itself that the amendment clarifies or declares existing law, "`obvious[ly] . . . is indicative of a legislative intent that the amendment apply to all existing causes of action from the date of its enactment. . . .' [Citations.]"[43] Another circumstance which makes plain this intent is that the amendment was made promptly in response to Salazar I and this case, both of which were granted review on the same issue by the California Supreme Court. Our initial construction of former section 12940(j)(1) was analogous to that in Salazar I, which the Legislature expressly intended to contravene by its amendment.

F. Application of the Amendment Is Constitutionally Prohibited
"When a legislative body clearly intends a statute or ordinance to operate retroactively, that intent must be enforced unless retroactivity is barred by constitutional constraints."[44] "Of course, a statute cannot be retroactively applied to the detriment of due process. [Citation.] . . . [A] retroactive statute generally offends due process by impairing a contract or a vested property right with insufficient justification."[45]
We find that applying the amendment retroactively is constitutionally objectionable. Constitutional considerations of due process require that citizens be fairly apprised of laws affecting their conduct. Here, the import of the amendment is to impose substantial new obligations on employers, and to impose such liability, without clear notice, for conduct which was already completed in the past.
Not only does the amendment impose new and significant liabilities for already-completed acts, it also does so in a way which is unfair both to employers and their employees. The amendment provides that an employer must anticipate and protect its employees from workplace harassment by nonemployees, but only as to sexual harassment. Employees who are harassed by nonemployees because of any other animus generally forbidden under the FEHA, such as race, ethnicity, national origin, age, and so forth, have no protection under the amendment. On the other hand, the amendment holds employers liable for nonemployee sexual harassment, but does not impose the same obligation on other entities *692 covered by the FEHA, such as labor organizations, employment agencies, or apprenticeship programs.
To prevent fundamental unfairness of all these kinds  imposition of substantial new liabilities without due notice, unequal treatment of employees, and unequal treatment of employers  we conclude the amendment cannot constitutionally be applied retroactively to this case. If it is applicable at all, its effect must be prospective only.

III. The Remaining Issues Need Not Be Decided
We have determined that the FEHA  more particularly, section 12940(j)(1) as amended  cannot be applied here to impose liability on the employer for the harassing conduct of Brown, its client/customer. Thus, we need not reach the additional questions of, e.g., governmental immunity, alleged instructional error, the form of the special verdict, and so on. Similarly, we need no longer be concerned with the trial court's supposed failure to consider the "failed relationship" defense, or to instruct on apportionment of fault, for purposes of assessing noneconomic damages, between the employer and Brown.
Finally, inasmuch as we must reverse the judgment, plaintiff is not the prevailing party, and the award of attorney fees must also be reversed.

DISPOSITION
As directed by the California Supreme Court, we have reconsidered the matter in light of the enactment of Statutes of 2003, chapter 671, section 1, page 4072. Upon such reconsideration, we conclude that the amendment was neither expressly retroactive nor, despite the Legislature's declaration to the contrary, merely declaratory of existing law. We further conclude that, although the Legislature did nevertheless clearly express an intent to apply the amendment retroactively, it is "constitutionally objectionable" to do so. Accordingly, we again reverse both the judgment and the award of attorney fees in plaintiff's favor.
Defendant shall recover costs on appeal.
We concur: RAMIREZ, P.J., and KING, J.
NOTES
[1] On January 22, 2003, the California Supreme Court had already granted review (130 Cal.Rptr.2d 656, 63 P.3d 215) in another case, Salazar v. Diversified Paratransit, Inc. (2002) 103 Cal.App.4th 131, 126 Cal.Rptr.2d 475 (hereafter, Salazar I), presenting the same issue. On August 13, 2003, the California Supreme Court granted plaintiff's petition for review in this case. (3 Cal.Rptr.3d 622, 74 P.3d 725.)
[2] Order of the California Supreme Court (Nov. 19, 2003) (7 Cal.Rptr.3d 315, 80 P.3d 201).
[3] Haas v. Meisner (2002) 103 Cal.App.4th 580, 586, 126 Cal.Rptr.2d 843.
[4] Hunt v. Superior Court (1999) 21 Cal.4th 984, 1000, 90 Cal.Rptr.2d 236, 987 P.2d 705.
[5] Curle v. Superior Court (2001) 24 Cal.4th 1057, 1063, 103 Cal.Rptr.2d 751, 16 P.3d 166.
[6] Watkins v. Real Estate Commissioner (1960) 182 Cal.App.2d 397, 400, 6 Cal.Rptr. 191.
[7] Younger v. Superior Court (1978) 21 Cal.3d 102, 113, 145 Cal.Rptr. 674, 577 P.2d 1014.
[8] People v. Pieters (1991) 52 Cal.3d 894, 899, 276 Cal.Rptr. 918, 802 P.2d 420.
[9] Clean Air Constituency v. California State Air Resources Bd. (1974) 11 Cal.3d 801, 814, 114 Cal.Rptr. 577, 523 P.2d 617.
[10] Harris v. Capital Growth Investors XIV (1991) 52 Cal.3d 1142, 1159, 278 Cal.Rptr. 614, 805 P.2d 873.
[11] Statutes of 1984, chapter 1754, section 1, pages 6403-6404, italics added.
[12] See County of Los Angeles v. Payne (1937) 8 Cal.2d 563, 574, 66 P.2d 658.
[13] Other provisions of the FEHA impose strict liability on the employer for the unlawful discriminatory acts of its supervisors and agents, without the qualifications expressed in the second sentence of section 12940(j)(1), for harassment by employees "other than an agent or supervisor."
[14] The second sentence of former section 12940(j)(1) provided: "Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Italics added.)
[15] In re J.W. (2002) 29 Cal.4th 200, 210, 126 Cal.Rptr.2d 897, 57 P.3d 363; Reno v. Baird (1998) 18 Cal.4th 640, 658, 76 Cal.Rptr.2d 499, 957 P.2d 1333.
[16] State Farm Mut. Auto. Ins. Co. v. Haight (1988) 205 Cal.App.3d 223, 236, 252 Cal.Rptr. 162 "successive drafts" of a pending bill "are helpful in interpreting a statute if it is conceded that the meaning is unclear." In this connection, as before, we grant the employer's motion to take judicial notice of legislative history documents concerning section 12940. Likewise, we again deny both the employer's request to take judicial notice of Brown's deposition testimony, and plaintiff's November 25, 2002 request for judicial notice.
[17] Statutes of 1982, chapter 1193, section 2, page 4260.
[18] Senate Bill No.2012 (1983-1984 Reg. Sess.)
[19] Italics (for proposed new language) and strikethrough type (for proposed deletion) in original.
[20] Central Delta Water Agency v. State Water Resources Control Bd. (1993) 17 Cal.App.4th 621, 634, 21 Cal.Rptr.2d 453.
[21] See, e.g., Coates v. Sundor Brands, Inc. (11th Cir. 1999) 164 F.3d 1361, 1366; Lockard v. Pizza Hut, Inc. (10th Cir.1998) 162 F.3d 1062, 1075; Rodriguez-Hernandez v. Miranda-Velez (1st Cir.1998) 132 F.3d 848, 854; Crist v. Focus Homes, Inc. (8th Cir.1997) 122 F.3d 1107, 1110; Folkerson v. Circus Circus Enterprises, Inc. (9th Cir.1997) 107 F.3d 754, 756.
[22] EEOC regulations: 29 Code of Federal Regulations, section 1604.11, effective November 10, 1980.

Enactment of the FEHA: Statutes of 1982, chapter 1193, section 2, pages 4258-4260.
[23] Page v. Superior Court (1995) 31 Cal.App.4th 1206, 1215-1216, 37 Cal.Rptr.2d 529.
[24] Statutes of 2003, chapter 671, section 1, page 4072.
[25] Statutes 2003, chapter 671, section 2, page 4073 (West's Cal. Session Laws 2003-2004).
[26] Murray v. Oceanside Unified School Dist. (2000) 79 Cal.App.4th 1338, 1348, 95 Cal. Rptr.2d 28.
[27] Newman v. Emerson Radio Corp. (1989) 48 Cal.3d 973, 978-979, 258 Cal.Rptr. 592, 772 P.2d 1059.
[28] Myers v. Philip Morris Companies, Inc. (2002) 28 Cal.4th 828, 841, 123 Cal.Rptr.2d 40, 50 P.3d 751.
[29] Western Security Bank v. Superior Court (1997) 15 Cal.4th 232, 243, 62 Cal.Rptr.2d 243, 933 P.2d 507.
[30] Evangelatos v. Superior Court (1988) 44 Cal.3d 1188, 1209, 246 Cal.Rptr. 629, 753 P.2d 585, italics added.
[31] Myers v. Philip Morris Companies, Inc., supra, 28 Cal.4th 828, 841, 123 Cal.Rptr.2d 40, 50 P.3d 751.
[32] Western Security Bank v. Superior Court, supra, 15 Cal.4th 232, 243, 62 Cal.Rptr.2d 243, 933 P.2d 507.
[33] Colmenares v. Braemar Country Club, Inc. (2003) 29 Cal.4th 1019, 1024, footnote 2, 130 Cal.Rptr.2d 662, 63 P.3d 220, citing Western Security Bank v. Superior Court, supra, 15 Cal.4th 232, 243, 62 Cal.Rptr.2d 243, 933 P.2d 507.
[34] Colmenares v. Braemar Country Club, Inc., supra, 29 Cal.4th 1019, 1024, footnote 2, 130 Cal.Rptr.2d 662, 63 P.3d 220, again citing Western Security Bank v. Superior Court, supra, 15 Cal.4th 232, 243, 62 Cal.Rptr.2d 243, 933 P.2d 507.
[35] Western Security Bank v. Superior Court, supra, 15 Cal.4th 232, 244, 62 Cal.Rptr.2d 243, 933 P.2d 507.
[36] Western Security Bank v. Superior Court, supra, 15 Cal.4th 232, 244, 62 Cal.Rptr.2d 243, 933 P.2d 507.
[37] Statutes 2003, chapter 671, section 2, page 4073, (West's Cal. Sessions Laws 2003-2004).
[38] Salazar v. Diversified Paratransit, Inc., supra, 117 Cal.App.4th 318, 334-335, 11 Cal.Rptr.3d 630 (Dis. opn. of Kitching, J.) (Salazar II).
[39] "See Assem. Bill No. 76, introduced December 23, 2002, and amendments dated February 26, 2003, February 27, 2003, and March 11, 2003."
[40] "Amendment of June 19, 2003, to section 1 of Assem. Bill No. 76, amending Government Code section 12940, subdivision (j)(1)."
[41] Salazar II, supra, 117 Cal.App.4th 318, 334-335, 11 Cal.Rptr.3d 630.
[42] Western Security Bank v. Superior Court, supra, 15 Cal.4th 232, 244, 62 Cal.Rptr.2d 243, 933 P.2d 507.
[43] Western Security Bank v. Superior Court, supra, 15 Cal.4th 232, 244-245, 62 Cal. Rptr.2d 243, 933 P.2d 507.
[44] Plotkin v. Sajahtera, Inc. (2003) 106 Cal. App.4th 953, 961-962, 131 Cal.Rptr.2d 303, citing Western Security Bank v. Superior Court, supra, 15 Cal.4th 232, 243-244, 62 Cal.Rptr.2d 243, 933 P.2d 507.
[45] Bank of America v. Angel View Crippled Children's Foundation (1999) 72 Cal.App.4th 451, 458-459, 85 Cal.Rptr.2d 117.